## BILLY ELDER V. AETNA CASUALTY & SURETY COMPANY.

No. A-2869. Decided February 7, 1951.
Rehearing overruled March 7, 1951.
(236 S. W., 2d Series, 611.)

*Maverick, Putman & Putman* and *Maury Maverick, Jr.,* all of San Antonio, for petitioner.

The Court of Civil Appeals erred in finding as a matter of law that petitioner was an independent contractor, and that, as a matter of law, the evidence did not raise the issue as to whether or not petitioner was an employee or an independent contractor. Pacific Emp. Ins. Co. v. Gage, 199 S. W. 2d 537; Herndon v. Halliburton Oil Well Cementing Co., 154 S. W. 2d 163; Shannon v. Western Indemnity Co., 257 S. W. 522.

*Carl Wright Johnson* and *Nat L. Hardy,* both of San Antonio, for respondent.

MR. JUSTICE BREWSTER delivered the opinion of the Court.

This is a Workmen's Compensation case, in which petitioner, Elder, is claimant against insurer, Aetna Casualty & Surety Co., respondent, for injuries received while delivering newspapers for Express Publishing Company, the insured. A trial court judgment for respondent, upon an instructed verdict, was affirmed by the Court of Civil Appeals. 230 S. W. 2d., 1018. These judgments went on the proposition that claimant was in independent contractor rather than an employee.

For some weeks before his injury Elder delivered newspapers for the insured over a prescribed route in San Antonio, and was so engaged when hurt. Before he began this work, claimant (then 16 years old) and insured entered into a written contract, the material provisions of which were:

"The publisher agrees to sell to the carrier and the carrier agrees to buy newspapers for sale to subscribers on Route No. D-3 in San Antonio or vicinity effective 6-15-48. The prices and terms shall be such as are fixed by the publisher from time to time.

"No interest in the route is sold to the carrier.

"The carrier agrees to pay publisher at its office in San Antonio, Texas, on or before the 5th and 20th of each month for all copies purchased by carrier during the preceding period.

"Carrier agrees to furnish to the publisher whenever requested a written list giving the name and address of each subscriber in regular order in which papers are delivered on the route and shall not give any list of subscribers to any other person.

"The carrier shall furnish his own equipment and means of conveyance and they shall be under his own exclusive charge and control and the publisher shall have no interest therein.

"In case the carrier utilizes the services of others, then he shall keep a record of his employees and fully comply with the Social Securities Act and the State Unemployment Insurance Act and all other laws and City Ordinances.

"It is agreed that the sole relationship between the parties is the sale of said papers by the publisher to the carrier and that no other relationship exists except that of seller and purchaser, and the carrier shall not have authority to represent or act for the publisher either as agent or employee.

"This contract may be terminated at any time by either party without any prior notice. Upon such termination the carrier shall deliver to publisher all paid-in-advance subscriptions (which publisher will then undertake to fulfill for carrier) and the names and addresses of all subscribers and expiration of their subscriptions and all accounts between publisher and carrier shall be immediately paid."

Petitioner asserts that this contract, on its face, suggests "an attempt at contractual subterfuge on the part of the publishing company to escape compensation coverage for its home carriers and at the same time retain and possess the right to

control Billy Elder as to the detailed manner in which he could perform his employment."

The only language which is urged as showing *of itself* such intention on the part of the insured is the provision: "This contract may be terminated at any time by either party without any prior notice." Petitioner quotes from 56 C.J.S., sec. 3(5), 56, 57, "Where the parties have the right to terminate the relationship at will, it indicates a master-servant relationship." However, in the same section it is said that if the status of independent contractor is otherwise clearly established, power to terminate the relationship at will does not change it to a master-servant relationship. We think the contract, on its face, establishes claimant as an independent contractor, so we attach no contrary significance to the provision that *either* party may terminate it at any time without notice. See Burton-Lingo Co. v. Armstrong (Civ. App.), 116 S. W. 2d., 791, error refused.

■ But petitioner contends that the insured used the contract as a mere cloak to exercise such control over him in the details of his work as a delivery boy as to create a master-servant relationship despite the contract. That this may occur is well recognized by our authorities and the same test applies, whether the claim lies within the field of common-law liability or arises out of the Workmen's Compensation Statutes. The test is: Did the publishing company actually assume and exercise such detailed control over Elder's physical conduct in the performance of the labor provided for in the contract as to make him a servant, even though the contract did not so provide? Carter Publications Co., Inc., v. Davis (Civ. App.), 68 S. W. 2d. 640, error refused; Texas Co. v. Wheat et al., 140 Texas 468, 168 S. W. 2d., 632; Federal Underwriters Exchange v. Turner (Civ. App.), 140 S. W. 2d., 885, error rfused; Davis v. General Accid. Fire & Life Assur. Corp. (Civ. App.), 127 S. W. 2d., 526.

The trial court having instructed the verdict, in applying the test in this case we must look to the testimony most favorable to petitioner's contention and reject all that tends to disprove it. That testimony comes from petitioner himself, and it relates principally to control exercised over him by one Little, district route manager for the publishing company.

Petitioner swore that when he started to work under the contract he was given a "collection book", which listed all subscribers in order, beginning on a designated street; that Little showed him where the route was and how it was to be done

and "for me to do just like he said and everything would be all right"; that "he showed me where to start and where to end"; that "I asked him one time if I could throw the route backward and he said it didn't make any difference to him, but that I was supposed to start with the route starting at Lavaca and Labor because if I started at the end of the route I would miss some people and he didn't want any complaints"; that Little told him it would be good business to put a subscriber's paper on the porch or that to put it in the front yard would be all right if it wasn't raining, but that if a paper was thrown upstairs and it fell downstairs to get it and put it upstairs; that one day in throwing papers he was working both sides of a street at once but couldn't throw very hard to reach the farthest side and that Little came by and "told me to get off my bicycle and walk across the street and put them over there"; that Little told him to collect from subscribers semi-monthly or monthly, "either way I wanted to," because a lot of people liked to pay on the first of the month and a lot of them liked to pay on the 15th; that Little told him not to get his book too far in advance because "if anything happened that I lost my route it would be too far in advance" (this in response to the question: "Did Mr. Little tell you anything in regard to collecting over 30 days in advance?") ; that if any subscribers failed to pay, it was petitioner's loss, so on one occasion he told Little that a certain man did not pay for a month, whereupon Little said, "Let it go a couple more weeks. He will pay for the paper. You will have to talk to him. Let it go. He will pay for it"; that he was not permitted to deliver anything but papers and Little once told him if he ever "caught me"putting circulars in the papers it would be "too bad"; that he got quite a few complaints from subscribers who had missed their papers, these complaints were put into the bundle of papers delivered to him each day and that the publishing company charged him 10 cents for each subscriber missed unless he went to the subscriber and apologized; that his papers were delivered by the publishing company at a given point near his route at 4:30 A.M. and that Little hold him to finish throwing the papers by 6 A.M., because "if I didn't get the papers out there would be more complaints and my bill would be bigger"; that if he was late Little would come by, wake him up, get him out of bed and tell him to go over there and get the papers out (this, he said, was an accommodation, which he appreciated) ; that the insured had contests among the delivery boys to see who could get the most sub-subscribers, that he got one prize for getting 59 new subscribers, and that "they would come around and pick you up and say 'O.K. Let's go to soliciting.' They wanted us to go out and get

more subscribers for the paper. We were not getting paid for getting subscribers but they would come by and would say, 'Let's go', and you went"; that some of his subscribers paid at the insured's office, which credited his account therewith and gave him a slip and he "threw that paper"; that the insured company furnished him a receipt book, which it printed and required him to use and for which he paid; that the company also furnished him a bag with the company's name on it in which to carry his papers, and for which they required him to pay.

■ We regard this testimony as establishing more than merely such control over claimant by Little as was necessary to secure performance of his contract with insured according to its terms and to accomplish the results contemplated by the contract. It is difficult to imagine a more detailed control in the means and manner of the performance of the work of a boy delivering a newspaper route than that exercised by Little over Elder in this case. It is unnecessary to discuss Carter Publishing Co., Inc., v. Davis, and other cases, supra, which hold that the alleged employee was an independent contractor, other than to say that they show no such control over all the details of the work to be done as that exercised in this case, under the claimant's testimony. Therefore, we hold that the trial court erred in not submitting the issue to the jury. Supporting cases from other jurisdictions, in which are shown at least some of the aspects of control which Elder said were exercised over him, are: Hann v. Times-Dispatch Pub. Co. 166 Va. 102, 184 S. E. 183; El v. Newark Star-Ledger et al., 131 N. J. L., 373, 36 Atl. 2d., 616; Hampton v. Macon News Printing Co. 64 Geo. App. 150, 12 S. E. 2d., 425; Salt Lake Tribune Pub. Co. v. Industrial Commission et al. 99 Utah 259, 102 Pac. 2d., 307; Press Pub. Co. v. Industrial Accident Commission of California et al. 190 Cal. 114, 210 Pac. 820; Wilson v. Times Printing Co. et al. 158 Wash. 95, 290 Pac., 691.

One ground urged by respondent in its motion for an instructed verdict was that the evidence wholly failed to show that claimant received his injury within the course of his employment. Upon that issue the Court of Civil Appeals said, "We have examined the testimony of appellant as contained in the statement of facts, and come to the conclusion that such testimony if credited by a jury would support a finding that Billy Elder was acting within the scope of his employment when injured." After a study of the testimony, we approve that holding. Of course, that issue will become material only in the event

the jury finds that claimant was an employee rather than an independent contractor.

It follows that both judgments below are reversed and the cause is remanded to the trial court.

Opinion delivered February 7, 1951.

Rehearing overruled March 7, 1951.