O. E. HARTSFIELD, Appellant,

v.

ANCHOR CASUALTY COMPANY, a/k/a Agricultural Insurance Company, Appellee.

No. 60.

Court of Civil Appeals of Texas.

Tyler.

Oct. 8, 1964.

Rehearing Denied Nov. 5, 1964.

Robert Roch, Brown, Kronzer, Abraham, Watkins & Steely, Houston, for appellant.

H. H. Prewett, Foreman, Dyess, Prewett, Henderson & Cantey, Houston, for appellee.

SELLERS, Justice.

This case originated in the 129th District Court of Harris County as a compensation case in which O. E. Hartsfield was plaintiff and Anchor Casualty Company was defendant.

On July 20, 1961, plaintiff was doing carpenter work on an apartment where Wolff Construction Company was the contractor for an apartment project. On this date plaintiff was standing on a stool and was hanging a door on a cabinet when the stool went out from under him and he fell to the floor. Mr. Hartsfield was taken by ambulance to a hospital where he was treated for a compression fracture of the first lumbar vertebra. He never returned to full-time work.

The trial was to a jury and the court submitted some sixteen Special Issues, all of which were answered by the jury in favor of the plaintiff. The jury found that plaintiff was totally and permanently injured while working for Walter F. Wolff and H. G. Wolff, doing business as Wolff Construction Company. The jury further found in favor of plaintiff for a lump sum settlement.

After the jury returned its verdict the plaintiff filed a motion for judgment on the jury's findings; the defendant filed motion for judgment non obstante veredicto. The trial court, after hearings on the motions denied the motion of plaintiff and granted defendant's motion and entered judgment that plaintiff take nothing. From this judgment the plaintiff has duly prosecuted this appeal. This appeal involves the jury's answers to Special Issues 1 and 2, which are as follows:

"SPECIAL ISSUE NO. 1

"Do you find from a preponderance of the evidence that on July 20, 1961, O. E. Hartsfield was not an independent contractor?

"ANSWER: 'He was not an independent contractor'

" 'He was an independent contractor.'

"An 'independent contractor' as used herein, is any person who in the pursuit of a business or occupation undertakes to do a particular work for other persons, and who has exclusive control of such work in respect to the details of the work to be performed and over whom the person for whom the work is being done has no right of control as to such details, and who represents the will of the person by whom the work is done only as to the results of his work and not as to the means or method by which it is accomplished.

"If you have answered Special Issue No. 1 'He was not an independent contractor', and only in that event, then answer:

"SPECIAL ISSUE NO. 2

"Do you find from a preponderance of the evidence that O. E. Hartsfield was an employee of Walter F. Wolff and H. G. Wolff, doing business as Wolff Construction Company on July 20, 1961?

"ANSWER: 'We do' or 'We do not.'

"You are instructed by the Court that within the meaning of the Workmen's Compensation Law of Texas an employee is a person in the service of another under any contract of hire, expressed or implied, oral or written, whereby the master retains or exercises, or has the right to exercise, the right of control in directing, not merely the end sought to be accomplished, but also the means and details of its accomplishment, not merely what shall be done, but how it shall be done."

It is the plaintiff's contention that the evidence is sufficient to support the jury's answers to these issues, the trial court having followed the defendant's contention that there is no evidence to support the jury's findings.

In deciding this issue it is this court's duty to look to the evidence most favorable to the verdict and reject all evidence unfavorable to the jury's findings. Elder v. Aetna Casualty & Surety Co., 149 Tex. 620, 236 S.W.2d 611.

We take the following statement of the evidence from appellant's brief:

"As stated before, the Plaintiff went to work for the elder Mr. Wolff, H. G. Wolff, around 1951 or 1952 and worked off and on for him for many years. Plaintiff began working in February of 1961 for Mr. H. G. Wolff and his son, Walter F. Wolff, on an apartment project, described as the 'Attucks Street' job, and while the Plaintiff was working on that job, Mr. Walter F. Wolff asked him to sign some papers, with a statement, 'here's some papers concerning your insurance; I'd like to get you to sign them for me.' The papers were not filled out, and Plaintiff did not read the papers, but testified that he signed one or more copies of the papers handed to him by Mr. Wolff. Plaintiff had never heard of an apartment job described as the 'Sixth and one half street job' when he signed the papers in February while he was on the 'Attucks Street job.'

"After completing the 'Attucks Street job', there was a lapse of a week or two before Plaintiff began working on the 'Seventeenth Street job'. At the time he began working on the 'Seventeenth Street job', there was no agreement that he would be working on the 'Sixth and one half street job', but while he was working on the 'Seventeenth Street job', he learned of the 'Sixth and one half street job'. Shortly after finishing his work on the 'Seventeenth Street job', Plaintiff started to work on the 'Sixth and one-half street job'. He was employed to do trim carpentry work on the apartments on the 'Sixth and one half street job', and was to be paid $175.00 per apartment. Plaintiff and Mr. Walter Wolff had some discussion regarding the laying of some pine floors in the 'Sixth and one half street job' apartments, which the Plaintiff did not do, but made arrangements for his son to perform.

"Defendant offered into evidence Defendant's Exhibit No. 5 which purports to be a 'labor contract' covering ten apartment units at 3514 and 3521 Attucks. Plaintiff testified that he did sign some blank pieces of paper while he was working on the 'Attucks street job', and that this appeared to be his

signature on Defendant's Exhibit No. 5. Defendant also offered into evidence Defendant's Exhibit No. 6, which purports to be another 'labor contract' to trim out three units of apartments at 211 West Seventeenth Street; lay pine floor in four units of apartments at 722 East Sixth and one half street; and trim out five units of apartments at 722 East Sixth and one half street. Plaintiff testified that it was his signature on Defendant's Exhibit #6. Plaintiff testified regarding Defendant's Exhibit No. 6 as follows on cross-examination:

"'Q. Now this—now, this is an identical contract as Defendant's Exhibit No. 5 is it not, except for the work that is to be done? I am talking about it as a printed; I didn't make myself clear.

"A. You remember these forms I signed on Attucks Street were not filled out, and this is one of them.

"Q. And it is your testimony that this was signed when you were work-over on Attucks Street?

"A. Yes, sir.

"Q. And it wasn't signed on the 2nd day of June at all?

"A. No, sir, it wasn't.

"Q. When was it signed?

"A. At the time that I was—the other one was signed on Attucks Street.

"Q. You don't know when that was? Was it—* * *

"A. (Interruption) Somewhere in February.

"Q. And you signed it and this one, No. 5 and Defendant's No. 5, you say it was in blank?

"A. It was. I was working and the other man came around. * * *

"Q. (Interrupting) Just answer my question. * * *

"MR. ROCH: (Interrupting) Your Honor, I think he is entitled to answer the question. We object to counsel cutting him off.

"THE COURT: Of course, the witness is entitled to explain it. He should conclude his answer before you ask the next question.

"Q. I merely asked you if this was signed in blank; was it?

"A. It was signed in blank.

"Q. All right.

"Now, you—you were given a copy of this were you not, Mr. Hartsfield?

"A. No, sir, I did not receive a copy of it.

"Q. You didn't get a carbon copy of either one of these contracts?

"A. No, sir, I didn't.

"Q. Now, are you sure about that?

"A. Absolutely.'

"Plaintiff testified regarding his arrangement with Mr. Walter Wolff concerning the 'Sixth and one half street job' as follows:

"Q. Let me ask you this:

On this Sixth and a half street job, what were you supposed to do? Trimming out apartments again, or what?

"A. Yes, sir, trimming out apartments.

"Q. Was that for so much an apartment?

"A. Yes, sir.

"Q. How much was it an apartment, if you remember?

"A. I believe it was $175.00.

"Q. Per apartment?

"A. Per apartment.

"Q. All right, sir, Was there also some flooring that Mr. Wolff wanted laid in those apartments?

"A. Yes, sir, there was some pine floors to be laid.

"Q. Did he talk with you about that?

"A. Yes, sir.

"Q. Did you do that work?

"A. No, sir, I did not.

"Q. What happened about that?

"A. I told him I had a son that could lay 'em, lay that for him. And I made the arrangements for my son to come lay the floor.

"Q. Did your son come lay the floor?

"A. Yes, sir.

"Q. Who paid him; did you pay him or did Mr. Wolff pay him?

"A. Mr. Wolff paid him.

"Q. Do you know how Mr. Wolff paid him?

"A. In cash.

"Q. That was for laying the floors?

"A. Yes, sir.

"Q. Now, did you start about that time, or a little bit later, working on the apartments?

"A. Yes, sir, I did.

"Q. Now, let me ask you this:

"When you talked to Mr. Wolff about working these apartments, did he send specifications to you, plans, and say, 'Now, I have got five apartments, or so many apartments, that I want trimmed out, and I want you to give me a bid on how much money you will do it for.' Did he do that?

"A. No, sir; no, sir.

"Q. All right. Did he—what did he do; how did he come to this $175.00, or whatever the figure was, whatever he was going to pay you, apparently how did that come about?

"A. He had two of his other men that was working for him trim out an apartment, as he wanted it done; and he carried me to that apartment, showed me how it was fixed, and that was wanting to use this as a model trimming out these other apartments for him.

"Q. Did he * * *

"A. (Interrupting) No, he told me how much he would pay.

"Q. He didn't ask you, then?

"A. No, sir.

"Q. He told you, 'You do this for X dollars', is that right?

"A. Yes, sir.

"Q. Did he tell you you could change it up any, or anything?

"A. Yes, sir.

"Q. He told you you could do it any way you wanted to?

"A. No sir, had to be done as —— according to the other apartment, or as he directed.

"Q. All right. Well, did you start working then?

"A. Yes, sir, I did.

"Q. Did you furnish the supplies, the nails and the boards and the various things?

"A. No, sir, I did not.

"Q. Did Mr. Wolff have those provided for you?

"A. He did.

"Q. He had them there.

"A. He had them there. Someone did; I presumed it was Mr. Wolff, but I'm not sure.

"Q. At least you didn't do that,

"A. I didn't do it.

"Q. And you furnished your own hand tools, I assume?

"A. That's right.

"Q. You had your own carpenter's tools?

"A. Yes, sir.'

"Plaintiff testified that he had been working at the 'Sixth and one half street job' approximately a week and a half or two weeks when he received his injury. Regarding the supervision of his work Plaintiff testified as follows:

" 'All right, sir.

"Now, during the time that you were working there at those apartments did Mr. H. Wolff or Mr. Walter Wolff ever come around where you were working?

"A. They did.

"Q. All right. Did they inspect what you were doing?

"A. Yes, sir, they did.

"Q. Did they tell you how to do it?

"A. Yes, sir, if it wasn't up to what they thought it was, right; they had me to do it according to the way they wanted it.

"Q. Let me ask you this, now:

"You had been doing finish carpentry work for about thirty years, haven't you?

"A. Yes, sir.

"Q. And I imagine you are pretty well able to do it without anybody having to tell you how to do it, aren't you?

"A. I think so.

"Q. You felt like you were a good carpenter, didn't you?

"A. Very good, or fairly good.

"Q. All right.

"Now, can you remember any specific occasion where either Mr. Walter Wolff or Mr. H. Wolff had to tell you to do something different than the way you had done it on any one of those apartments?

"A. Yes, sir.

"Q. Tell the jury about that.

"A. Well, one particular instance was where a cabinet had—I had built a bar with an overhead cabinet, and I squared the cabinet out from the wall from which it was joined to.

"But, that wall wasn't square with that wall over yonder (indicating with his hands) where the rest of the cabinet was built. So Mr. Wolff comes in and sees the difference * * *

"Q. (Interrupting) What Mr. Wolff was that?

"A. That was Walter Wolff. Shall I continue?

"Q. Yes, sir, excuse me.

"A. Mr. Wolff comes in and looks at it, as well as I remember; he measured the distance from one end to the other and had me to move it over where it would square with the other cabinet.

"Q. Well, did he say to you; 'Now, Mr. Hartsfield, I think it would be for your benefit to move it over?'

"A. No, sir, he did not.

"Q. Did he say, 'Move it over'?

"A. He said 'move it over.'

"Q. All right. And did you move it?

"A. I did.

"Q. You did what he told you to do?

"A. Yes, sir.

"Q. Had you built that cabinet according to the way the other apartments showed it?

"A. Yes, sir.

"Q. But he didn't want it that way?

"A. No, sir.

"Q. And he had you move it?

"A. He had.

" * * *

"Q. Would you have obeyed anything Mr. Wolff told you to do on that job, sir?

"A. Yes, sir, I would."

The record reflects that Mr. Hartsfield usually went to work when the other employees did, ate his lunch at the same time, and quit in the evenings at the same time. On cross-examination Mr. Hartsfield testified:

"He would come around about twice a day, and if he saw anything that wasn't to his liking, or to his suiting, why, he would tell me about it and I would fix it that way, according to the way he wanted it."

It was the testimony of Mr. Hartsfield that he did not sign any contract for the Seventeenth Street Job or at the Sixth and One Half Street job, that when he signed the blank papers the Sixth and one half street job where he was injured was not even in contemplation of the parties. It is undisputed by the defendant's witnesses that Mr. Hartsfield was an excellent carpenter and needed little supervision at any time.

One of the witnesses for the defendant was doing the same kind of work that Mr. Hartsfield was doing but under a verbal contract; and on the issue of whether or not the Wolffs had right of control, his testimony was to the effect that they certainly did and he so recognized their rights. Mr. Walter F. Wolff testified in behalf of defendant that the contract of June 2 was signed by Mr. Hartsfield at that time, and on cross-examination it was shown that Mr. Wolff admitted that the contract involving the Seventeenth Street job, as well as the Sixth and one half street job, and at the time it was purported to be signed, the Seventeenth Street job had been completed. His only explanation of this discrepancy was that he was a poor bookkeeper. Mr. Hartsfield and his wife testified that after Mr. Hartsfield was injured and in the hospital, Mr. Wolff came by the hospital and in the presence of Mr. Hartsfield and Mrs. Hartsfield advised them not to worry that his Workmen's Compensation Insurance would take care of Mr. Hartsfield and his bills.

 Under this evidence it is our opinion that the same amply supports the jury's findings to the two Special Issues above set out. The jury certainly had a right to disregard the so-called written contract completely. Newspapers, Inc. v. Love, Tex., 380 S.W.2d 582. When these contracts are eliminated there is little else to evidence a contract other than Mr. Hartsfield was an employee of the Wolffs. He furnished his own tools; so did the other employees. Hartsfield was not to furnish any of the materials; he was not to be the judge of the materials used. Surely if anybody had that duty it was the Wolffs.

Without going into all of the evidence, we think the above is sufficient to support the jury's findings, and our holding is supported by the following authorities: Southern Underwriters v. Samanie, 137 Tex. 531, 155 S.W.2d 359; Dealers National Insurance Company v. Jackson, Tex.Civ.App., 363 S.W.2d 297; Pan American Insurance Company v. Stokes, Tex.Civ.App., 370 S.W. 2d 955; Gaines v. Allstate Insurance Company, Tex.Civ.App., 353 S.W.2d 471; American General Insurance Company v. Sims, Tex.Civ.App., 278 S.W.2d 586.

There has been filed in this cause a Suggestion of Death filed by Mrs. Maude Hartsfield, and informs this Court that the appellant in this cause died on March 22,

1964, and that Mrs. Hartsfield is his widow and community survivor, and moves this Court to substitute her as appellant in this cause.

■ This appeal was pending when the appellant died, and we are of the opinion that the Suggestion of Death is well taken and Mrs. Hartsfield will be substituted as appellant in this cause. The holding is in keeping with Rule 369–a, Texas Rules of Civil Procedure:

> "If any party to the record in a cause dies after rendition of judgment in the trial court, and before such cause has been finally disposed of on appeal, such cause shall not abate by such death, but the appeal may be perfected and the Court of Civil Appeals or the Supreme Court, if it has granted or thereafter grants a writ therein, shall proceed to adjudicate such cause and render judgment therein as if all the parties thereto were living, and such judgment shall have the same force and effect as if rendered in the lifetime of all the parties thereto. If appellant dies after judgment, and before the expiration of the time for perfecting appeal, sixty days after the date of such death shall be allowed in which to perfect appeal and file the record, and all bonds or other papers may be made in the names of the original parties the same as if all the parties thereto were living."

The Supreme Court, in the case of Galveston City Ry. Co. v. Nolan, 53 Tex. 139, took occasion to discuss the statute from which this present rule is derived, and held:

> "The manifest object of the statute is to allow litigation in the Supreme Court to proceed unaffected by the death of the parties, and the proviso, in the same spirit, hastens determination in that court of useless litigation, but enacts no new forfeiture or loss of rights as the consequence of death.

The proviso was designed not to vacate judgments, but to guard against the abuse of the statute by those whose right of recovery was dependent on the establishment of their original cause of action, and whose cause of action therefore did not survive."

This Court has reviewed the appeal and find it necessary to reverse the trial court's judgment which was entered non obstante veredicto, and the trial court is hereby ordered to enter judgment for appellant in keeping with the jury's verdict for a lump sum recovery, with interest from date of the original erroneous judgment of the trial court. Nederlandsch-Amerikaansche-Stoomvaart-Maatschappij; Holland-American Line v. Vassallo, Tex.Civ.App., 365 S.W.2d 650.

■ The appellee contends that this Court would be in error in allowing the lump sum award of the jury to stand and that we should allow at most only the amount accrued in weekly payments up to the date of the death of the appellant. With this contention we cannot agree. There was no judgment for weekly payments entered in this case and none was authorized by the jury verdict. We have found that the jury's verdict was supported by the evidence, and we do not feel that we would be authorized to disturb its findings on the lump sum settlement.

We do not regard the case of Travelers Insurance Company v. Bailey, 375 S.W.2d 540, as controlling in this case for the reason if no other than that the judgment there was for weekly benefits and not a lump sum.

Nor do we regard the case of Texas Employers Ins. Ass'n v. Phillips, 130 Tex. 182, 107 S.W.2d 991, as controlling for the reason that the case on appeal had been reversed and had been re-tried in the trial court.

No Texas case is found involving our fact situation; however, we think our holding is supported by the case of Monson v.

Battelle, 102 Kan. 208, 170 P. 801 (Kansas) case, from which we quote:

"That decision, however, if accepted as sound, would not control here. In the present case the plaintiff had obtained an absolute personal judgment requiring the immediate payment of a fixed amount. It was the legal duty of the defendant to pay it at once, unless a stay should be procured pending an appeal. If payment had been made, the money would have been wholly at the disposal of the plaintiff. If the final result is an affirmance, it will amount to an adjudication that the rights of the parties shall remain as fixed at the time the judgment was rendered. The defendant gains no immunity from the fact of his having taken an appeal which is ultimately determined not to have been well founded."

Judgment of the trial court is reversed and judgment ordered entered in the trial court in keeping with the jury's verdict.