James L. STIMSON, Appellant,

v.

AETNA INSURANCE COMPANY, Appellee.

No. 17249.

Court of Civil Appeals of Texas.

Dallas.

March 21, 1969.

Rehearing Denied April 25, 1969.

Bert Bader, of Bader, Wilson, Menaker & Cox, Dallas, for appellant.

James A. Williams, Bailey, Williams, Weber & Allums, Dallas, for appellee.

DIXON, Chief Justice.

This is a workmen's compensation suit in which a summary judgment was rendered against appellant James L. Stimson and in favor of appellee Aetna Insurance Company.

Stimson in his suit alleges that at the time he was injured on August 15, 1966 he was an employee of C. A. Osborn, appellee's insured.

Appellee filed a general denial and later a trial amendment alleging that Stimson was not an employee of Osborn's but was an employee of J. R. Warren, a subcontractor.

The only question before us, raised by appellant's one point of error, is this: does the record disclose a genuine issue of material fact as to whether Stimson was Osborn's employee at the time he was injured?

AFFIDAVIT OF C. A. OSBORN

In support of its motion for summary judgment appellee submitted the affidavit of C. A. Osborn. We here present a summary of his affidavit. In August of 1966 Osborn was under contract with A. G. Calvert to handle the remodeling of a building at 610 South Hampton Road. It was his responsibility to hire and pay subcontractors on whatever basis he desired. He entered into an oral contract with J. R. Warren to do all the brick work and the placing of haydite blocks. His contract called for him to pay Warren on a contract basis rather than an hourly wage. Warren was to utilize employees of his own as he saw fit, and to pay such employees out of the contract money due him and to make whatever arrangements he desired to their supervision and control. Osborn did not provide Warren with any employees, nor did he attempt any supervision or control over Warren's men. However he did supervise the job itself in a general way in order to co-ordinate all of the work.

Warren obtained employees to do his work. Osborn did not hire Stimson, make any arrangements with him whatever, or pay him, or any of the persons employed by Warren. Osborn had no knowledge of the arrangements between Warren and Stimson and Warren's other employees, and never discussed the matter of payment or other arrangements with him or his employees.

At about 2:30 P.M. on August 15, 1966 Osborn was on the premises where the work was being done and heard a loud noise. He ran into the building and found

Stimson lying on the floor. It appeared that he had fallen from a scaffold. He was taken from the premises in an ambulance called by Osborn.

At the time Osborn entered into his contract with Warren the latter told him he had workmen's compensation insurance. Osborn did not inquire of Warren how many employees he would have working on the job. No deductions were made by Osborn from Warren's contract price for any kind of taxes, insurance premiums, or social security payments, and Osborn has no knowledge with respect to whether Warren made any such deductions from the money he agreed to pay his employees, including Stimson.

## AFFIDAVIT OF FRANCIS PARTAIN

Partain worked on the building at 610 South Hampton Road. Stimson went to work on the building at the same time Partain did. Stimson gave Partain instructions as he passed on some orders from Osborn. But Osborn was in charge and gave Partain specific orders about details of the job. He stayed right on top of Partain and Stimson. He did more than just give general instructions as to what was to be accomplished. He gave specific instructions to Partain as well as Stimson as to *how* the work was to be done. Osborn watched Partain at work and from time to time gave Partain direct orders about the way he was setting the tile and about how he wanted Partain to do his work. Partain obeyed Osborn's instructions and orders because Osborn was Partain's employer. He did not just make suggestions, he gave orders and Partain did as he was told.

## AFFIDAVIT OF STIMSON

On August 11, 1965 Stimson reported to the job at 610 South Hampton. He reported to Osborn, who gave him instructions about the job. Osborn laid out the job and Stimson helped him. Osborn measured the job as he wanted it and instructed Stimson where the openings would be and instructed Stimson in the details of how the job would be done. Osborn told him he was running the job for a man named Calvert and that he, Osborn, was the boss and Stimson should take all of his orders from Osborn. Osborn watched everything on the job and when things weren't right, he would change them. Stimson worked right with Osborn so as to be able to get the details of the job right as it went along. Every detail on the job came from Osborn, who instructed Stimson how he wanted things done and would also give instructions to the other tile men on the job. Osborn was on the job all the time Stimson was there, and not only asserted that he had the right to control the details of the job, but actually gave instructions as to the details of how the job was to be done. Stimson and the other men followed Osborn's instructions.

## STIMSON'S DEPOSITION

Stimson's oral deposition was taken. A summary of his testimony follows.

He was hired by a fellow named Warren, whom he did not know and had never met before. They met in a cafe. Somebody told Warren that Stimson was a bricklayer and introduced them. Stimson was caught up on his work at the time and Warren asked him to help on the job for two or three days. Upon inquiry Warren told him that the wages would be $4.25 per hour. Stimson was "kind of" overseeing the brick work. Warren only came by the job a time or two. Why he came by Stimson did not know for Warren seldom talked to Stimson, but he did inquire how Stimson was getting along. He did not talk to Stimson about the job. Stimson has not been paid for his work. Three men, including Stimson, were laying tile. He made no arrangements with Warren as to how he would work.

Stimson got all his orders "and everything" from Osborn. If he wanted to know anything he asked Osborn. Osborn never discussed salary with Stimson. He

never represented to Stimson that he was paying him. Warren told him he was to take orders from Osborn. Warren did not tell him that he, Warren, had been hired to do the tile laying job. Every brick mason furnishes his own hand tools and Stimson was using his at the time. Warren told him Osborn was running the job or had charge of it, so he went out to the job and met Osborn and started work. Warren never told him how he, Warren, was involved.

## OPINION

In determining whether the employer-employee relationship exists the test is the right of control, not the exercise of control by the person alleged to be the employer. However our Supreme Court has held that in cases where there is no express contract, or where the terms of the employment are indefinite, the *exercise of control,* though evidentiary only and not the ultimate test, may be the best evidence available in determining the *right of control.* Newspapers, Inc. v. Love, 380 S.W. 2d 582, 590 (Tex.Sup.1964); Halliburton v. Texas Indemnity Ins. Co., 147 Tex. 133, 213 S.W.2d 677, 680 (1948); Southern Underwriters v. Samanie, 137 Tex. 531, 155 S.W.2d 359, 362 (1941); American Fire & Casualty Co. v. Baker, 431 S.W.2d 956, 958 (Tex.Civ.App., Houston 1968). In other cases the rule is acknowledged, though in some instances the facts did not warrant the application of the rule. Anchor Casualty Co. v. Hartsfield, 390 S.W.2d 469, 471 (Tex.Sup.1965); Lone Star Gas Co. v. Kelly, 46 S.W.2d 656 (Tex.Com.App.1932). In at least one case it was held that the exercise of control determined that the employer had the right of control though the contract on its face indicated otherwise. Elder v. Aetna Casualty & Surety Co., 149 Tex. 620, 236 S.W.2d 611 (1951).

Appellee in support of the court's judgment cites among other cases Shannon v. Western Indemnity Co., 257 S.W. 522 (Tex.Com.App.1924); Dave Lehr, Inc. v. Brown, 127 Tex. 236, 91 S.W.2d 693 (Tex.Com.App.1936, opinion adopted); and Lone Star Gas Co. v. Kelly, 46 S.W.2d 656 (Tex.Com.App.1932).

In all the cases cited by both parties the decision turns on the facts of the particular case. If the evidence is clear that the alleged employer did not have the right of control, the mere fact that he did exercise a measure of control in the way of general supervision will not make him an employer within the master-servant relationship. But where the record evidence fails to establish an express contract, or the terms of the employment are indefinite the exercise of control may at times be looked to in determining the issue.

We must bear in mind that this is a summary judgment case in which the question is whether a fact issue exists and all doubts must be resolved against the movant of the summary judgment. We have concluded that a fact issue was raised by the evidence, which is indefinite as to the terms of Stimson's employment. There is testimony that Osborn went far beyond the general supervision which a general contractor has a right to exercise over a job as a whole. There is testimony that he exercised control of the details of the work and how it was to be done by Stimson.

Our holding in this case is not inconsistent with our holding in the recent case of Goodnight v. Zurich Ins. Co., 416 S.W.2d 626, 627 (Tex.Civ.App., Dallas 1967, writ ref'd n. r. e.). In *Zurich* the undisputed evidence established beyond any doubt that Goodnight was not an employee of Houston, the general contractor, appellee's insured. He was an employee of McDonald, a subcontractor.

We sustain appellant's point of error and reverse the judgment and remand the cause for further proceedings in the trial court.

Reversed and remanded.