**LIVING, INC., Appellant,**

v.

**Louis REDINGER, Appellee.**

**No. 01–82–0926–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Jan. 19, 1984.

Rehearing Denied March 15, 1984.

Elaine B. Davis, Baker & Botts, Houston, for appellant.

Stephen W. Hanks, Helm, Pletcher & Hogan, Linda Addison, Stephen K. West, Robert N. Kepple, Fulbright & Jaworski, Houston, for appellee.

Before DOYLE, WARREN and LEVY, JJ.

## OPINION

DOYLE, Justice.

This is a personal injury case in which the appellee was awarded damages in the amount of $126,215.15, based upon a jury's finding that the appellant, the general contractor, was fifty percent negligent in creating a dangerous condition upon a job site. The injury complained of was directly caused by an independent contractor who was also found by the jury to be fifty percent negligent.

By this appeal, the appellant seeks reversal on two basic points. First, the appellant argues that a general contractor is not liable for the negligence of an independent contractor; and, second, that the misconduct of the jury resulted in harm to the appellant.

The claim arises from an accident which took place on October 7, 1977 on one of the appellant's construction project sites. The appellee was a pipe-layer for one of the appellant's subcontractors. As the appellee was wrapping a chain around a length of pipe, his left index finger was crushed by the box blade of a tractor driven by Bobby Baird, an independent contractor. As a result, the appellee's injured finger had to be amputated. At the trial below, the appellee claimed that the appellant was liable for the injuries to the appellee's finger because the appellant negligently created a dangerous condition on the site by ordering Baird to operate the tractor in close proximity to the place where the appellee was working.

 The central issue raised by the appellant in points of error one through thirteen is whether there was sufficient evidence or any evidence of a breach of legal duty, owed by the appellant to the appellee. In considering no evidence points, the court must weigh only the evidence and inferences which support the findings, reviewing the evidence in its most favorable light, and rejecting inferences which are contrary to the findings. *In Re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1960); *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965). In disposing of the insufficiency points, we will consider all of the evidence.

In the case below, the jury found in special issues three, four, five, six, and nine that the appellant's employee, job superintendent Harold David Yargo, negligently created an unreasonably dangerous condition by allowing defendant, Bobby Baird, to operate his tractor in the immediate area of the appellee. Consequently, the jury found that the appellant was responsible for fifty percent of the negligence that caused the appellee's injury.

The legal theory on which the appellee based his claim and special issues submitted, is discussed in *Shell Oil Co. v. Waxler*, 652 S.W.2d 454 (Tex.App.—Houston [1st Dist.] 1983, no writ). There an employee of an independent contractor was trampled and severely injured by his co-employees who knocked him down as they were leaving the Shell job site. In response to the special issues submitted, the jury found that Shell had negligently created a dangerous condition, by requiring the

independent contractor's employees to exit the job site through two lanes only four feet in width. On appeal, the court acknowledged that as a general rule, a landowner has no duty to protect the employees from a dangerous condition, controlled solely by the independent contractor. However, the court also recognized that when a landowner interferes with or intermeddles in a dangerous activity conducted by an independent contractor, he may be held liable to the independent contractor's employees for injuries resulting therefrom.

The court found sufficient evidence from which the jury "could have reasonably inferred that Shell had assumed joint responsibility with its contractor for safety procedures." *Shell Oil Co. v. Waxler, supra.*

The courts discuss the general contractor, the landowner, and the owner/occupier of land in the same context when ruling upon their liability in situations involving legal duties owed to independent contractors. In *Remuda Oil & Gas Co. v. Nobles,* 613 S.W.2d 312 (Tex.Civ.App.—Fort Worth 1981, no writ), the oil company was found negligent, through its agent, in not staking down a flow line which struck and injured Nobles, an independent contractor. Because Remuda's representative, Tom Ellsworth, was present at the well site and told Nobles what to do, the court found that such interference or intermeddling was sufficient to support the jury's findings that Remuda was negligent. *Id.* at 316.

Appellant's basic contention is that it breached no duty which a general contractor owes to the employees of a subcontractor, i.e., that a general contractor must warn of unreasonably dangerous conditions existing on the premises, as opposed to transitory dangers arising from the activity of an independent contractor. As tried and briefed before this court, appellee's case did not complain of an *existing dangerous condition* at the job site. Appellee was seeking to hold appellant liable for the negligent manner in which it ordered and directed Baird to remove the dirt from the job site in such close proximity to where appellee was working that a dangerous situation was created which resulted in injury to appellee. To this end, evidence was adduced from which the jury could consider whether, and to what degree, appellant, Baird or appellee were negligent.

The appellant complains that the trial court allowed the jury to find it liable for the tortious conduct of Bobby Baird. The record does not support this contention. The trial court granted the appellant's motion for partial summary judgment, ruling that the appellant was not liable vicariously for Baird's negligence. This ruling in no way precluded appellee from asserting a cause of action for negligence directly against the appellant. A similar situation arose in *Hamilton v. Fant,* 422 S.W.2d 495 (Tex.Civ.App.—Austin 1967, no writ):

> Appellees alleged as a basis for their suit a theory of primary liability on the part of appellants for their negligence. There was no allegation and no contention that appellants' liability was of a vicarious nature in connection with the negligence of Pierce. The theory of appellees' case embraces the contention that the landowner has a duty to give proper instructions even to an independent contractor for work done on the owner's property. 422 S.W.2d at 501.

In *Hamilton,* the court found that the landowner breached a legal duty which he owed to the plaintiff, an independent contractor, by giving him improper instructions.

Although this exact issue is one of first impression before Texas courts, as far as we can determine, other jurisdictions have long recognized the general contractor's liability in similar situations. *See, Basciano v. George Fuller,* 4 Misc.2d 322, 150 N.Y.S.2d 312 (S.Ct. Bronx County, N.Y. 1956); *Henry Pierson Sons v. Gohr,* 126 Md. 385, 94 A. 1021 (1915); *Garland v. Townsend,* 217 Mass. 297, 104 N.E. 731 (1914). In *Basciano,* an employee of an independent contractor was injured when he was struck on the head by a piece of concrete dropped by a different subcontractor working above him. The court held that in those places used in common, and over which the general contractor has supervisory control, there is an element of

liability imposed on the general contractor, if he disregards the probable consequences of the acts of others. *Id.*

Similarly, the 2nd Restatement of Torts § 414 p. 1120 (1930) states that a failure to properly supervise the method of operation, even though the immediate fault was that of the subcontractor's employee, may result in liability where there is evidence that it was the duty of the general contractor to observe such operation. *See Pelowski v. J.R. Watkins Medical Co.*, 120 Minn. 108, 139 N.W. 289 (1912).

■ As a matter of reason, it makes no difference whether the negligence of an independent contractor, combined with the failure of a general contractor to provide for the overall safety of the premises, results in injuries to a fellow employer, or to another independent contractor. Therefore, we adopt the rule of other jurisdictions that the general contractor will be held liable if he creates a dangerous condition for an independent contractor by his directions to another independent contractor over whom he exercises control. Legally, the rationale set forth in *Shell v. Waxler* and *Remuda, supra* is sound, and we extend that reasoning to the facts presented by the case at bar.

■ Based on the entire record, we find there was sufficient evidence from which the jury could reasonably find that the job superintendent, who was working for the appellant, breached his legal duty to provide for the general safety of the premises, and that he had assumed joint responsibility with the independent contractor for safety procedures to be followed on the premises.

At the time of the appellee's injury he was laying pipe near the entrance of the project for an independent contractor of the appellant. The evidence indicated that the accident occurred in the entrance to the project, which was approximately thirty feet in width. Several piles of dirt blocked the entrance way, and decreased the amount of working space available for the workmen.

The appellant's job superintendent testified that he ordered the defendant, Bobby Baird, to use the tractor to move the dirt which was only five feet away from the pipes on which the appellee was working.

The president of the appellant testified that the duty of its superintendent was to co-ordinate the activities of the subcontractors, and to insure that the work of one contractor did not create danger for the other contractors. Yargo also testified that although each subcontractor was responsible for the general safety of his own employees, he, as superintendent, was responsible for the overall safety of the entire job.

Two witnesses to the accident testified that there was not enough room or space in the area for both the pipelayers and the tractor. Moreover, Yargo testified that he watched Baird operate the tractor in close proximity to the pipelayers for almost an hour. Therefore, the jury's express findings that Yargo negligently created a dangerous condition, and thereby breached his legal duty to the appellee, are firmly supported by the evidence. The appellant's points of error one through thirteen are overruled.

In the appellant's twentieth point of error, it contends that the trial court erred in overruling its motion for new trial on the ground of material jury misconduct. The appellant argues that the evidence established numerous acts of material jury misconduct which probably resulted in injury to the appellant. Specifically, the appellant argues that the trial court's finding of facts concerning the jury's discussion of attorney's fees, and the defendant Baird's ability to pay, was so "grossly incomplete and understated as to be inaccurate." The appellant also claims that there is no evidence to support the court's findings that the foreman of the jury and others, instructed the panel not to consider or discuss the subjects of attorney's fees, Bobby Baird's ability to pay, liability insurance, and how attorneys choose the amount for which to sue.

■ The centuries-old problem of jury misconduct has been before the court on many occasions and has resulted in some

well-defined guidelines. Rule 327, Tex.R. Civ.Proc., provides that in order to prove jury misconduct, an appellant must establish three things: (1) an overt act of misconduct; (2) that the misconduct was material; and (3) that the record as a whole, reflects that injury probably resulted. *See Fountain v. Ferguson*, 441 S.W.2d 506 (Tex.1969). The trial court has considerable latitude when considering whether to grant a new trial for jury misconduct. *Sanchez v. Texas Employer's Ins. Ass'n.*, 618 S.W.2d 837 (Tex.App.—Amarillo 1981, no writ). The appellate court will not reverse a trial court's findings of the facts unless there is a clear showing of abuse of discretion. *Id.* However, the legal conclusion of probable harm is assessed by the "appellate court unfettered by the ruling of the trial court." *Treasure City v. Strange*, 590 S.W.2d 816 (Tex.Civ.App.—Dallas 1979, no writ). Therefore, when there is conclusive evidence of jury misconduct, the appellate court is bound by case precedent and not contrary trial court rulings. Whether or not jury misconduct occurs in a case is a question of fact, but a question of law is presented as to whether injury probably resulted and must be resolved by the court. *Flores v. Dosher*, 608 S.W.2d 831 (Tex.Civ. App.—Corpus Christi 1980), rev'd on other grounds 622 S.W.2d 573 (Tex.1981); *City of Houston v. Quinones*, 142 Tex. 282, 177 S.W.2d 259 (1944).

On the motion for a new trial, five of the jurors testified concerning the jury's discussion of liability insurance, Bobby Baird's financial ability to pay his share of the judgment and how the attorney fees would be paid. At least one juror changed his vote on another issue after the discussion, and by so changing, made the majority vote on the damage issue possible.

A short summary of the testimony of each of the five jurors is submitted. *Arthur Lewis* testified that some of the jurors who wanted to give the $125,000 were trying to get the dissenters to join them by arguing that the appellee would receive only half of the award because in all likeliness there would be no collection from Mr. Baird who was not in court. This would mean that only Living, Inc. "would pay and then plus he would pay attorney's fees and all." Some of the jurors made calculations as to the amount the appellee would receive after the appellant paid one-half of the award and attorney's fees were deducted. They calculated that Bobby Baird would pay nothing.

*Mike Hodges* testified that during the discussion it was said that the appellee would probably pay one-third attorney's fees and that if Baird paid nothing, this amount would come out of what the appellant paid and that therefore the appellee would get substantially less than what he was being awarded. It was discussed that Baird was absent and would probably pay nothing. An actual calculation was made that projected that the appellee would actually receive about $15,000 after allowing for Baird's inability to pay.

*Turner Lee Hector* testified that the legal secretary brought up the fact that appellee's lawyer would get one-third of the amount that would be left for appellee after deducting one-third of $125,000.00. Specifically, Hector testified:

Q. (By Ms. Davis) What was stated about the amount of attorney's fees that Mr. Redinger might have to pay?

A. Okay, they said—that legal secretary brought it out and said that he was going to have to pay one-third, and so a couple of jurors got a pencil out to see if they paid one-third attorney's fees what he would receive after it was over with. So we based that on the amount that we gave.

Q. Can you tell us whether the one-third was to come out of the $125,000?

A. Yes.

\* \* \* \* \* \*

The Court: I will let him say what they talked about.

Let me ask a question.

Mr. Hector, in the discussion, did the jurors say that since Bobby Baird was not there that he wouldn't have to pay anything?

The Witness: Right.

The Court: And that the recovery would be one-half of $125,000? Was something like that stated?

The Witness: Yes, sir.

The Court: And that a third of that would go to the lawyers?

The Witness: Yes.

The Court: Okay, let's move along.

Q. (By Ms. Davis) Did these discussions about the deductions for attorney's fees and the probability of Bobby Baird not paying his part of the award influence your decision on damages?

A. Yes, it did.

Q. Would you not have given $125,000 ever without that discussion?

A. Well, when we first voted, I didn't vote for it.

Hector also testified that the jury foreman never warned them not to talk about attorney's fees, Bobby Baird's absence, or the amounts given by insurance policies. Hector's further testimony reveals the following:

Q. (By Ms. Davis) Okay, was there some discussion during the course of your deliberations regarding the percentage to be attributed to Living, Inc. versus Bobby Baird? Was there some discussion about Bobby Baird's absence?

A. Yes, there was a lot of discussion about his absence.

Q. And what was discussed?

A. Okay, when we started on the issue—a number of jurors decided they would give—I think they wanted to split it up. Okay, Bobby Baird, they said he should be responsible because he was the driver.

Okay, I think some of the jurors were going to give him seventy percent and give Living, Inc. thirty percent and at the end is when we decided since he wasn't going to be around, we would just split it up fifty-fifty.

*Judy Scott Smith,* a legal secretary, testified that the jurors discussed the fact that the appellee would have to pay one-third to one-fourth in attorney's fees. She also stated that others said that the appellee would have to pay one-third attorney's

fees. There was also some discussion to the effect that if Bobby Baird defaulted on his obligation to come to trial, he would probably default on his obligation to pay. When asked about the mention of an American Express insurance policy, Ms. Smith testified that it was mentioned and a discussion ensued as to what the policy paid for the loss of a finger and an eye. Ms. Smith testified as follows about how attorneys determined the amount to sue for in petitions:

Q. Did you say that the amount of money that lawyers put in petitions, the amount their pleading for is not just an arbitrary figure?

A. I believe I mentioned that everything was governed by—there were certain guidelines according to the Texas Statutes and that if the Plaintiff was asking for $125,000 that was not out of line. That there was some reason, that it was following a guideline.

Q. Okay. There were some statutory guidelines that was being followed by the lawyer in pleading for $125,000?

A. I brought up the fact that I did not think that this was just pulled out of the air. That in our discussion that I felt quite sure that a very reasonable approach had been made for that figure.

*Ana Carapetyan,* the jury foreman, testified that the jury discussed the fact that the appellee would have to pay one-third of the amount awarded him to his lawyer as attorney's fees. It was also discussed by the jury that Bobby Baird might not be found to pay his part of the damages.

From this testimony, the trial court drew the following findings of fact and conclusions of law:

### Findings of Fact and Conclusions of Law

Comes now the Court and makes the following Findings of Fact and Conclusions of Law.

#### Findings of Fact

1. The subject of attorney's fees was mentioned by a member of the jury during deliberations.

2. When the subject of attorney's fees was mentioned during deliberations, the Foreman of jury and others instructed the panel that such was not to be considered, and the discussion of attorney's fees ended.

3. The mention of attorney's fees occurred after the final vote was taken on the issue of damages, and no votes were changed after mention of attorney's fees.

4. A member of the jury panel brought up the subject of whether Defendant Bobby Baird would ever be able to pay his part of the judgment.

5. When the subject of Defendant Bobby Baird being able to pay his part of the judgment was mentioned during deliberations, the Foreman of the jury and others instructed the panel that they were not to consider this, and the discussion of Mr. Baird's ability to pay his part of the judgment ended.

6. The mention of Defendant Baird's ability to pay his part of the judgment occurred after the final vote was taken on the issue of damages, and no votes were changed after mention of Defendant Baird's ability to pay his part of the judgment.

7. Members of the jury discussed how much a disability insurance policy might pay for various kinds of injuries.

8. It was never mentioned or discussed by any member of the jury at any time whether any party to this case might or might not be protected by liability insurance in this case.

9. When the subject of liability insurance was mentioned during deliberations, the Foreman of the jury and others instructed the panel that insurance was not to be discussed, and the discussion of liability insurance ended.

10. The mention of liability insurance occurred after the final vote was taken on the issue of damages, and no votes were changed after mention of liability insurance.

11. One member of the jury stated during deliberations that lawyers do not pick the amounts they sue for out of the air, but that such amounts are chosen for a reason.

12. When the subject of how attorneys choose the amount to sue for was mentioned during the deliberations, the Foreman of the jury and others instructed the panel that this was not to be considered.

13. The mention of how attorneys choose the amount for which to sue occurred after the final vote was taken on the issue of damages, and no votes were changed after mention of this.

14. There was no material misconduct on the part of the jury panel during deliberations.

### Conclusions of Law

1. The conduct of the jury during deliberations did not constitute material misconduct.

2. If the acts of the jury during deliberations did constitute material misconduct, there was demonstrably no injury to any party as a result of such conduct.

SIGNED this 10 day of December, 1982.

/s/ W. Ervin James
JUDGE PRESIDING

■ We can find no basis for the trial judge's findings that the discussions about liability insurance, how attorneys choose the amount to sue for, attorney's fees, and Bobby Baird's ability to pay his part of the judgment, all occurred after the *final vote* was taken on the issue of damages. After a final vote was taken, we fail to see why an extensive discussion of the issue would have been necessary. From the testimony, it appeared that the jurors would first take a "straw vote" on each issue and then vote upon it prior to any discussion. If enough agreed to render a valid verdict, unanimous or by majority, the jury would then go to the next issue without discussion. This failing, the jury would then discuss the issue. The undisputed testimony shows that the jury took a vote prior to any discussion on the damages issue that resulted in ten jurors in favor of and two against awarding the appellee $125,000.00. However, this vote did not constitute a verdict and hence was not a final vote,

because the ten jury members who voted for the award were not the same ten who had voted unanimously on all previous issues. This condition triggered the discussion of the damages issue in an effort to get a valid verdict. As this court views the jury's activity, the initial vote became valid or meaningful only if it were unanimous or reflected a legal majority. A final vote was imperative after the stalemate developed on the damages issue. Indeed the appellee states in his brief that "Even though the Jury had ten members voting the same on the damage issue, this did not constitute a verdict because one of the members of the ten had voted differently from the majority on one previous issue. The *Jury commenced the discussions about the damage issue....*" (Emphasis ours). Thus, as a matter of undisputed sequence and fact, the discussions under consideration came before a final vote was taken. There is no evidence to support the trial court's findings numbers 3, 6, 10, and 13 to the effect that discussions on the subject items occurred after the final vote was taken on the issue of damages. We conclude that there was jury misconduct and that because it grew out of a discussion aimed at resolving the key damage issue, such conduct was material. Further, from the testimony, we draw the conclusion that the discussions were very extensive on the matters of attorney's fees, liability insurance, how attorneys choose the amounts for which to sue, and Bobby Baird's ability to pay. Neither are we convinced that there was any meaningful admonishment from the jury foreman to the jurors to cease such discussions.

This case is very similar to *White Cabs v. Moore*, 146 Tex. 101, 203 S.W.2d 200 (1947), which was reversed by the Texas Supreme Court because of jury misconduct. In *White Cabs*, the jury was divided as to the amount of damages. After a discussion concerning the amount of attorney's fees that would possibly be deducted from the award, the jury reached its final decision. The court held that a jury's discussion of attorney's fees is calculated to prejudice the rights of the defendant. *Id.* at 202.

In this case, as in *White Cabs*, the court is not free to speculate as to what effect the discussion had on the final outcome of the vote. The "reasonable conclusion is that they were probably induced by that discussion to agree to the answer that was made." *Kastanos v. Ramos*, 581 S.W.2d 740, 742 (Tex.Civ.App.—Houston [14th Dist.] 1979) *citing, White Cabs, supra.*

In concluding that the various acts of misconduct were material and probably resulted in harm to appellant, we particularly note the erroneous statement of the law by one of the jurors who was a legal secretary to the effect that the amount of damages put in their petitions by lawyers "was governed by—there were certain guidelines according to the Texas Statutes..." This declaration was expressed as a fact rather than a mere opinion and was equivalent to expert testimony outside of the record. *City of Houston v. Quinones, supra* at 263. The error is compounded when the testimony represents a misstatement of the law and such misconduct was held to be material and harmful by the Texas Supreme Court in *Flores, supra.*

The appellee repeatedly mentioned in his brief and oral argument that no votes were changed after the admittedly improper discussions. We do not agree. See Turner Lee Hector's testimony set out above.

Who is to say that in a discussion free of forbidden comments, some of the jurors who voted in favor of the $125,000 would not have changed to some lower amount? Who can determine whether those ten jurors would have held firm to the higher figure had their decisions not been bolstered by the "expert testimony" of the legal secretary, the mathematical calculations of another juror and the amounts payable for finger losses in the personal policies of the "couple of jurors" who brought their insurance policies? We are forbidden to become entangled in this web of speculations. *White Cabs, supra.*

The appellee seems to be laboring under the misapprehension that the function of the discussion on the ten-to-two vote in favor of the award of $125,000 was to

persuade the dissenters to agree with the majority. On the contrary, we view such deliberations as offering a forum where the dissenters may equally urge reconsideration and compromise of the issues, unfettered by illegal discussions.

Although the misconduct apparently only occurred in connection with the damages issue, Rule 434, Tex.R.Civ.P. prevents the court from separating the damages issue from the liability issue. *Kastanos, supra.* The appellant's twentieth point of error is sustained.

The judgment of the trial court is reversed and the cause is remanded for a new trial.

For Publication TEX.R.CIV.P. 452(b).

## ON MOTIONS FOR REHEARING

Both parties have filed motions for rehearing. We shall discuss the appellee's motion first.

 In his motion for rehearing, the appellee complains that the court is bound by the trial court's finding of fact no. 14 to the effect that there was no *material misconduct* on the part of the jury panel. First, it should be pointed out that the trial court erred in making such a fact finding, since such question is a matter of law. *White Cabs v. Moore,* 146 Tex. 101, 203 S.W.2d 200 (1947). The trial court was authorized to find whether there was *jury misconduct* which is a question of fact and we think that it did so. The findings of fact to the effect that the subject of attorney's fees was mentioned; of whether Bobby Baird would ever be able to pay his part of the judgment; of how much a disability insurance policy might pay for various kinds of injuries; and that lawyers do not pick the amounts they sue for out of the air, but that such amounts are chosen for a reason, show on their face that *jury misconduct* did occur. Whether or not injury probably resulted is a question of law which we must consider regardless of how the trial court ruled upon the identical matter. *Treasure City v. Strange,* 590 S.W.2d 816 (Tex.Civ.App.—Dallas 1979, no writ). *Flores v. Dosher,* 608 S.W.2d 831 (Tex.Civ.

App.—Corpus Christi 1980), rev'd on other grounds 622 S.W.2d 573 (Tex.1981).

The appellee has mentioned the inadmissibility of the alleged jury misconduct under Rule 606(b) of our present Texas Rules of Evidence, which became effective September 1, 1983. Suffice it to say that such rule would not be applicable to the case before us because the cause of action arose on October 7, 1977, went to trial on July 5, 1982, and the appellant's motion for new trial was overruled November 5, 1982.

Finally, we consider the appellee's cross-point which we failed to address in the original opinion. We have carefully reviewed the evidence adduced which would tend to show whether Bobby Baird was an independent contractor or an employee of the appellant. By his pleadings, the appellee sought to hold the appellant vicariously liable for the negligence of Bobby Baird.

An independent contractor has been defined as any person who, "in the pursuit of an independent business, undertakes to do a specific piece of work for other persons, using his own means and methods, without submitting himself to their control in respect to all its details." *William Sommerville & Sons, Inc., v. Carter,* 571 S.W.2d 953, 956 (Tex.Civ.App.—Tyler 1978), aff'd. 584 S.W.2d 274 (Tex.1979).

 The standard tests for determining whether one is acting in the capacity of an independent contractor measure the amount of control that the employer exerts or has a right to exert over the details of the work. *Newspapers Inc. v. Love,* 380 S.W.2d 582 (Tex.1964).

Generally, the court analyzes five factors: (1) the independent nature of the workman's business; (2) his obligation to furnish necessary tools, supplies, and materials to perform the job; (3) his right to control the progress of the work except as to final results; (4) the time for which he is employed; (5) the method of payment, whether by the time or by the job. *Pitchfork Land and Cattle Co. v. King,* 162 Tex. 331, 346 S.W.2d 598, 603 (1961); *William Sommerville & Son, supra; Eagle*

*Trucking Co. v. Texas Bitulithic Co.*, 590 S.W.2d 200 (Tex.Civ.App.—Tyler 1979, rev'd on other grounds, 612 S.W.2d 503 (Tex.1981).

If, after examining these five factors, the court finds that there is conflicting evidence as to the status of the workman, the issue should be submitted to the jury. *Eagle Trucking Co., supra.* However, if the facts are not disputed, and the evidence is "reasonably susceptible of but a single inference, the question whether the relationship of employee and independent contractor exists is one of law for the court." *Id.* at 212; *Rodriquez v. Zavala,* 279 S.W.2d 604, 606–7 (Tex.Civ.App.—San Antonio 1955, no writ); 57 C.J.S., *"Master and Servant,"* § 617.

The undisputed evidence before the trial court indicated that Baird performed tractor work, such as cutting sidewalks and driveways on construction sites. He also did clean-up work, hauled dirt to and from construction sites, and hauled trash.

During all of these operations, Baird used his own equipment consisting of two tractors and three trucks; paid his own employees who worked on the appellant's construction sites, and paid for his own gas. His wife did the bookkeeping and prepared the bills which were submitted to the appellant. Baird worked only as needed for the appellant and was usually paid either a set rate or at an hourly set-rate, depending on whether he could predict the amount of time necessary to complete a job.

Generally, the only control that the job superintendent Yargo exerted over Baird was in directing what needed to be cleared, cut, or hauled away. Yargo also testified that if he saw Baird operating the tractor in an unsafe manner, he would direct him to stop, or would have fired him. The fact that the appellant exercised some general control or supervision over Baird did not show that appellant had the right to control the details of the work. *Newspapers Inc., supra; Elder v. Aetna Casualty & Surety Co.*, 149 Tex. 620, 236 S.W.2d 611, 613 (1951).

The evidence shows that appellant exercised control over Baird for the purpose of seeing that work was done properly and expeditiously. The cases are legion which hold that "This manner of general control over an independent contractor does not result in making him a servant." *Texas Employers Insurance Ass'n v. Bewley,* 560 S.W.2d 147 (Tex.Civ.App.—Houston [1st Dist.] 1977, no writ).

We find the controlling facts by which we determine whether an individual is an independent contractor to be undisputed. This presented a question of law which we hold that the trial court properly resolved by granting the appellant's partial summary judgment motion. All of the appellee's points of error are overruled and his motion for rehearing is denied.

In considering the appellant's motion for rehearing, we notice that no new points of view are presented to the position previously stated in the appellant's brief. We therefore deny the appellant's motion for rehearing.

For Publication. TEX.R.CIV.P. 452(b).