560 S.W.2d 147 (1977)
TEXAS EMPLOYERS INSURANCE ASSOCIATION, Appellant,
v.
Leonard Ray BEWLEY, Appellee.
No. 16957.
Court of Civil Appeals of Texas, Houston (1st Dist.).
December 1, 1977.
Rehearing Denied January 5, 1978.
*148 Clark, Thomas, Winters & Shapiro, Barham J. Bratton, Mary Joe Carroll, Austin, for appellant.
Helm, Pletcher, Hogan & Burrow, Richard P. Hogan, Houston, Dillon, Giesenschlag, Sharp & Delaney, John M. Delaney, Bryan, for appellee.
COLEMAN, Chief Justice.
This is a worker's compensation case. After a jury trial a judgment was entered in favor of Bewley for partial permanent compensation benefits. The Insurance Association asserts that the judgment should be reversed for the reasons that the finding that Bewley was an employee of Lambert Construction Company is without support in the evidence. The Association also asserts that there is no evidence, or in the alternative insufficient evidence, that Bewley worked 210 days in the same employment or in similar employment during the year immediately preceding the date of his injury, and further that there is no evidence or insufficient evidence to support the jury's finding on wage rates.
Bewley is the owner of a business which supplies heavy equipment and trained operators to construction projects. In June 1973, pursuant to an oral contract with Lambert Construction Company, Bewley was operating a backhoe with a front-end loader on Lambert's construction site. Bewley drove the machine into a partially constructed building to pick up sidewalk fill. As the top of the backhoe was being raised, it hit a joist, causing several beams to fall. One or more of the beams struck Bewley causing the injuries for which he seeks compensation.
Article 8309, Sec. 1 Tex.Rev.Civ. Stat.Ann. (1967), expressly excepts independent contractors under the definition of "employees" and thus excludes their coverage under the Act. It is the burden of a claimant to show his employee status. Industrial Indemnity Exchange v. Southard, 138 Tex. 531, 160 S.W.2d 905 (1942).
An employee is defined in the Worker's Compensation Act as a "person in the service of another under any contract of hire, express or implied, oral or written." Whether a workman is an employee or an *149 independent contractor depends on whether the purported employer has the right to control the workman in the details of the work to be performed. Where the contract between the parties fails to establish the status of the workmen, an employee-employer relationship may be established circumstantially by evidence of actual exercise of control. Anchor Casualty Co. v. Hartsfield, 390 S.W.2d 469 (Tex.1965).
Important evidentiary facts to be considered in determining the status of a workman as being an employee or an independent contractor were innumerated in the case of Industrial Indemnity Exchange v. Southard, 138 Tex. 531, 160 S.W.2d 905 (1942), in these words:
"The general rule relating to independent contractors rests upon certain recognized tests; although such tests are not necessarily concurrent with each other, nor is each test in itself controlling. Such tests are: (1) the independent nature of his business; (2) his obligation to furnish necessary tools, supplies, and material to perform the job; (3) his right to control the progress of the work, except as to final results; (4) the time for which he is employed; and (5) the method of payment, whether by time or by the job."
Mr. Bewley has a large investment in heavy equipment such as backhoes, tractors, trucks, ditching machines and trenchers. Mr. Bewley testified that since 1960 he has been essentially in business for himself. Mr. Gayle Jones, superintendent for Lambert Construction Company called him on the phone and asked him if he could do some backhoe work on the Lambert job. He testified that when someone called him to do work he usually asked them how much work they had and how long it would take so that he could plan his work. When he went on the job the superintendent or foreman on the job would tell him what to do and show him where it was to be done and "direct us in doing it". While Bewley sometimes contracted work on a turn-key basis or charged by the lineal foot, he usually charged by the hour. Occasionally he would lease a machine, but ordinarily he furnished the operator and charged by the hour for the machine and operator. His son worked for him in the business and sometimes he hired other operators. When he had more than one job going he would operate a machine. His son would always "go first". When he billed his customers he did not show separate charges for the machine and the operator. He paid his own social security tax and withholding tax.
When Mr. Jones called him to work for Lambert Construction Company on the Star Furniture job he did not know exactly what work was to be done. He was not furnished plans and specifications. He was paid on invoices for the number of hours worked at $17.50 per hour. He didn't know how many hours he would work on any particular day. He did the work that the job superintendent told him to do. On this particular job he did excavation around the foundation, did some grading work, cut out for the sidewalks, loaded trash on the truck, moved some pipe, and moved some sand. He and his son worked on the job at different times. When he was doing excavation or grading work, the contour and grade lines were set by employees of Lambert Construction Company. These employees assisted with the fine grading by giving directions to the operator. This was usually done by hand signals signifying whether it was necessary to go deeper or to fill in. The final work was accomplished by Lambert employees using shovels. A machine operator is a member of a skilled trade. Lambert Construction Company employees did not undertake to tell the operator how to handle his machine. Mr. Bewley testified generally that he was doing whatever the job superintendent wanted him to do by the hour. He further testified that he had not been on anybody's payroll since 1960.
When we consider the evidence bearing on the recognized tests set out in Industrial Indemnity Exchange v. Southard, supra, we find that Bewley did not furnish material, was not able to come or leave at his own discretion, was paid by the hour rather than by the job, was not furnished with the plans and specifications of the job to be done, *150 that he did such jobs as were within the capability of the machine as were pointed out to him by the contractor. These facts point to his status as being that of an employee.
On the other hand Bewley was in the independent business of renting expensive equipment and furnishing skilled operators. He determined the compensation to be paid the operator and withheld his social security and income taxes. A special skill was required to operate the machines. At various times both Bewley and his son operated the equipment on that particular job. The hourly payment made by Lambert Construction Company included both the rental of the equipment and the compensation to the operator. The job superintendent did not tell the operator how to operate his machine, and it seems reasonable to conclude that the job superintendent could not fire the operator without the consent of Bewley. These facts alone would lead to the conclusion that Bewley was an independent contractor.
The job superintendent determined when and where the machine was to be operated and had the right to control the end results to be obtained. There is no evidence that the superintendent attempted to tell the operator how to use the machine in order to obtain the expected results. The evidence would support an inference that the control which Lambert Construction Company exercised over the operator of the machinery was for the purpose of seeing that the work was properly and expeditiously done and proper results accomplished. This manner of general control over an independent contractor does not result in making him a servant. Dave Lehr, Inc. v. Brown, 127 Tex. 236, 91 S.W.2d 693 (1936).
It is settled that where there is no dispute about the controlling facts, and there is but one reasonable conclusion that can be inferred from such facts, the question of whether one is an employee or an independent contractor is one of law, and not of fact. Pitchfork Land and Cattle Company v. King, 162 Tex. 331, 346 S.W.2d 598 (1961).
Here there was no undertaking to do a specific piece of work. Bewley was to operate the machine to perform a task assigned by the job superintendent. It was contemplated that he was to work until a particular job was completed. The inference might be drawn that he was in service at the will of the parties. While Bewley occupied the position of a contractor in renting out the service of his machine and in undertaking to furnish a competent operator, at the time of the accident he was operating the machine and occupied much the position of a borrowed employee. Contradictory reasonable conclusions can be reached from the facts established by the testimony. In such a case there is a question for the jury. Industrial Indemnity Exchange v. Southard, supra. Since the facts are essentially without dispute and the decisive issue is the inferences that can be drawn from these facts, the jury's finding that Bewley was an employee of Lambert Construction Company is supported by sufficient evidence. Texas Employers' Ins. Ass'n v. Owen, 298 S.W. 542 (Tex.Comm'n App., Section B); Hilgenberg v. Elam, 145 Tex. 437, 198 S.W.2d 94 (1946); Southern Underwriters v. Samanie, 137 Tex. 531, 155 S.W.2d 359 (1941).
The Insurance Association contends that the answers made by the jury to Special Issue No. 11 and 12 are supported by no evidence or in the alternative by insufficient evidence. Special Issue No. 11 inquired whether Bewley had worked in the employment in which he was working on June 22, 1973, whether for the same employer or not, for at least 210 days of the year immediately preceding such date. The jury found that he had so worked.
Bewley testified that he knew for a fact that he had worked at least 210 days in the year preceding the date of the accident. He said that would mean that he worked about two out of every three days. On cross-examination he was asked if he kept records as to who operated a machine on any particular occasion and he stated that *151 he did not. He testified that he could tell when he was working by the fact that the invoices would show more than one machine working on a particular date. When more than one machine was working, he would be operating one of the machines. He testified that he always sent his son out first. The evidence reflects that on some occasion he did jobs as an independent contractor and that on a few occasions he had rented his machine without an operator. He stated that if the invoice showed that a machine worked eight hours on one job and another machine worked eight hours on another job on the same day he would have been operating one of the machines. He further stated that he did not go back and break down his records to see how many days he had actually worked, and, although requested to do so, he failed to bring his records into court. He stated that he kept the records in a bay over the machinery at the shop and that some of them might have been destroyed by rats, water or something.
Bewley was injured on June 22, 1973. His income tax returns showed that he paid out labor costs in the sum of $10,143.50 in the year 1972, and the sum of $12,156.16 in the year 1973. He testified that he paid his son $8.00 per hour. His income tax return reflects that the business, Bewley Welding and Trenching, had gross receipts of $48,519.59 in the year 1973 and $54,502.64 during the year 1972. Using these figures the appellant has demonstrated mathematically that Bewley's employees worked 158½ days in 1972, 170½ days in 1973. The appellant then asserts that since Bewley testified that he did not work as an operator unless his son was also working; the evidence conclusively shows that appellee did not work as many as 210 days preceding his injury since his son did not work as many as 210 days in either 1972 or 1973. However, the evidence does not show how many days the son worked in any particular month. There is evidence that sometime during the years 1972-1976 the son lost time from work because of a broken leg. Neither the month nor the year when this occurred appears in the evidence. It is possible that there was a great deal of work during the months of January 1 to June 22, 1973 and during the months of June 22, 1972 to January 1, 1973 and that as a result Bewley worked as many as 210 days during that period of time. There is evidence to support the answer made by the jury to Special Issue No. 11.
In answer to Special Issue No. 12, the jury found that the average daily wage which Leonard Ray Bewley earned during the days that he actually worked during the year preceding his injury was $64.00. In answer to Special Issue No. 10, the jury found that the sum of $128.00 represented the reduction in Leonard Ray Bewley's average weekly earning capacity during the period of his partial incapacity. It was instructed to find the difference between his average weekly wages before the injury and the average weekly earning capacity during such partial incapacity. Bewley testified that he had not been on anyone's payroll during that year. The evidence shows that most of the work that he did as an operator was on an hourly rate. In effect he set his own pay since he billed his customers by the hour for both the use of the machine and the work of the operator. He testified that he had no weekly draw from his business but that all funds earned by the business were deposited in the bank and he drew checks for his expenses as needed. In the pleading on which he went to trial Bewley alleged that for at least 210 days of the 12 month period immediately preceding his injury he had been engaged in the same employment he was performing when injured and was receiving for the work an average weekly wage of $320.00 per week. He further alleged that by reason of his injury under the Worker's Compensation Act and his employer's compensation policy he was entitled to payment of 401 weeks of disability payments in an amount equal to 60% of the "aforesaid" average weekly wage rate of $320.00, not to exceed $49.00 per week. He alleged no alternative grounds for determining the average weekly wage.
*152 Section 1(1), Article 8309, VACS reads:
"If the injured employee shall have worked in the employment in which he was working at the time of the injury, whether for the same employer or not, for at least two hundred ten (210) days of the year immediately preceding the injury, his average weekly wage shall consist of three hundred (300) times the average daily wage or salary which he shall have earned during the days he actually worked in such year, divided by fifty-two (52)."
Aetna Insurance Co. v. Giddens, 476 S.W.2d 664 (Tex.1972) the court stated:
"When a workmen's compensation claim is made, the compensation rate cannot be computed until the workman establishes a weekly wage rate in accordance with the requirements of Article 8309. If he has worked at least 210 days in the same or similar employment in the same or neighboring place during the year immediately preceding his injury, his own wages are controlling. This is Subdivision (1) of the statute and is known as step 1. If the injured workman has not himself worked so much in this work and area, he must then take his proof to Subdivision (2) of the statute or step 2, and establish the average weekly wage rate of another employee of the same class who has worked similarly for at least 210 days in the prior year. Subdivision 3 or step 3 provides for a wage rate "just and fair" to both parties, but resort may not be had to the "just and fair" provisions until the workman has borne his burden of proving by competent evidence that his wages cannot be computed under Subdivision (1) or (2)."
In Texas Employers Ins. Ass'n v. Clack, 134 Tex. 151, 132 S.W.2d 399 (1939) it is stated:
"... In the first place, subsection 1 sets forth the method of arriving at the average annual wages alone. After this is done, if that section be applicable, resort must then be had to subsection 5 to determine the average weekly wages. It is obvious, however, that subsection 1 is not applicable except in case where the employee is working for a daily wage. It is not even contended that plaintiff in this case was working for a daily wage; therefore subsection 1 passes out of consideration. Likewise subsection 2 has no application, for it applies only when the employee is working for a daily wage. Under that section the average annual wage is the thing to be ascertained, and, if that section be applicable, resort must again be made to subsection 5 to determine the weekly wages.
It is further obvious that subsection 3 has application to those mentioned in subsections 1 and 2 whose annual wages cannot be computed under either of the first sections, or who for some reason have not received wages for as much as a year; in which case the board is authorized to fix the average weekly wages according to what is fair and just between the parties. As the thing left to be determined under that section is the average weekly wages, it appears to be certain that this section was intended to apply specifically when there was no annual salary or wages, or no practical method of ascertaining an annual salary. Therefore, under this section there is no occasion to resort to subsection 5.
It seems to us clear that the statute contemplates that in all cases where the annual earnings or salary can be ascertained with reasonable certainty, either by taking three hundred times the daily wages, or by taking the actual annual earnings or salary which the employee has received during the preceding year, when not employed upon a daily basis, but working for substantially the whole of the year upon a salary basis, said annual salary or earnings becomes the determining factor or basis of compensation; and the weekly wages shall be one-fifty-second part of said annual earnings or salary."
The Clack case was one where the plaintiff had been employed by Phillips Petroleum Company for a number of years, and had been working for that company alone *153 for the year preceding his injuries. During the year preceding his injuries plaintiff had been paid for his services a salary of $122 per month, which was paid in monthly installments. During said year under the operation of the NRA Code, plaintiff was permitted to work only four days in one week and five days in the next week. As the result of such arrangements he worked a total of only 234 days during the year, although he was regarded as in the employment of said company during the whole of the year. "He had not received any daily wages. His monthly salary of $122 was in no manner affected by the fact that he worked four days in one week and five days the next week." At that time an employee was required to work substantially 300 days during the preceding year to qualify under section 1.
In Texas Employers Ins. Ass'n v. Reed, 150 S.W.2d 858 (Tex.Civ.App.Amarillo 1941, writ dism'd, jdgmt cor.) the court said:
"... The claimant herein worked in the same employment for a daily wage and worked "substantially the whole of the year immediately preceding the injury". Therefore his "average annual wages" would consist of 300 times his "average daily wage", and his "average weekly wages" would amount to one-fifty-second part of his "average annual wages...."
The Supreme Court has held that the definition of average weekly wage before or at the time of the injury as contained in Section 1 of Article 8309, supra, clearly refers to money which the employee "shall have earned" or which another employee "shall have earned". The court said:
"... Whether these issues are determined by stipulation or by jury verdicts, the fact remains that "average weekly wage" deals with earnings and "average weekly wage earning capacity" deals with capacity...." Employers Reinsurance Corporation v. Holland, 162 Tex. 394, 347 S.W.2d 605 (1961).
In Traders & General Ins. Co. v. Turner, 149 S.W.2d 593 (Tex.Civ.App.Fort Worth 1941, no writ), the plaintiff was in the employ of his employer at all times during the year preceding the date of his injury, however, the work was intermittent not continuous and he worked by the hour when there was work to be done. In this case the court assumed that the parties were making no contention on appeal that the worker's wage rate could be fixed under either of Subsections 1 or 2 of Section 1, Article 8309, but the insured contended that it could have been fixed under Subsection 5 of Section 1. The court said that appellee had no annual, or even monthly or weekly wage, but worked by the hour. The court then said:
"... Clearly Subsection 5 could not be applied, but resort must be had to Subsection 3 which provides in effect, when the wage rate cannot be fixed under either Subsections 1 or 2, or for other good and sufficient reasons it is impracticable to compute the average weekly wages, it shall be computed by the Board (or court) in any manner which may seem just and fair to both parties ...."
There is no evidence from which the jury could compute the plaintiff's average weekly wage under Section 1. A substantial portion of his gross income as shown by his income tax reports is derived from rental on the equipment. While there is evidence that he worked and earned money as an operator, there is no evidence that he was paid a particular sum as wages. There is no evidence that during the year immediately preceding the date of his injury he worked as many as eight hours in any particular day or as many as forty hours in any particular week. While there is evidence that at times he had rented his machinery without furnishing an operator, there is no evidence to show the charge made for his machinery. There is testimony which would establish the amount of the union wage, and that a union worker ordinarily worked eight hours per day and forty hours per week. There is also testimony that he *154 paid his son the union scale. This evidence would support a finding under paragraph 3, section 1, Article 8309, supra, but it is not evidence which will support the finding of the daily wage which Bewley earned during the days he actually worked. The evidence is legally insufficient to support the answer made by the jury to Special Issue No. 12, in answer to which the jury found that Bewley earned an average daily wage of $64.00.
It was Bewley's burden to prove "the difference between his average weekly wages before the injury and his average weekly wage earning capacity during the existence of such partial incapacity." Art. 8306, § 11, Vernon's Annotated Civil Statutes; Angelina Casualty Company v. Jones, 493 S.W.2d 247 (Tex.Civ.App.Beaumont 1973, no writ). Since the evidence is legally insufficient to establish the plaintiff's average daily wage, there is no evidence from which the jury could have found the plaintiff's average weekly wage prior to his injury. The evidence therefore is legally insufficient to support the jury's answer to Special Issue No. 10 by which it found that Leonard Ray Bewley's average weekly earning capacity during the period of his partial incapacity was $128.00.
By submitting Special Issue No. 11, the plaintiff clearly elected to prove compensation under Section 1(1) of Art. 8309, supra. No special issues were tendered or submitted which would establish his wage rate under Subsection 2 or 3. The trial court erred in entering a judgment based on the jury's answers to Special Issue No. 10 and Special Issue No. 12. Aetna Insurance Company v. Giddens, 476 S.W.2d 664 (Tex. 1972); Texas Employers' Insurance Association v. Shannon, 462 S.W.2d 559 (Tex.1970); Employers Reinsurance Corporation v. Holland, 347 S.W.2d 605 (Tex.1961).
The Insurance Association has presented other points of error. Since the case must be reversed, an extended discussion of these points is not required. We have determined that they are without merit.
The judgment is reversed and the cause is remanded.