SHELL OIL COMPANY, Appellant,

v.

Mitchell V. WAXLER, Appellee.

No. 01–82–0010–CV.

Court of Appeals of Texas,
Houston.

March 3, 1983.

Rehearing Denied May 12, 1983.

David B. Weinstein, Houston, for appellant.

John Milutin, Jack Martin, Houston, for appellee.

Before EVANS, C.J., and DOYLE and COHEN, JJ.

## OPINION

EVANS, Chief Justice.

Shell Oil Company appeals from a judgment entered for the plaintiff, Mitchell V. Waxler, in an action to recover damages for personal injuries sustained while working on Shell's premises. The plaintiff, an employee of Brown & Root, Inc., was injured in November 1977, while doing construction work for Brown & Root at a refinery plant owned by Shell in Deer Park, Texas. Shell had contracted with Brown & Root to construct a portion of the expanded refinery improvements, and Brown & Root had employed Waxler as a heavy equipment operator. Waxler's complaint against Shell is that it negligently failed to protect him against a dangerous condition on its premises, resulting in his being trampled and severely injured by his co-employees as they were leaving the Shell job site.

Shell filed a cross action against Brown & Root, seeking contribution and indemnity, but took a non-suit of that action prior to trial. In response to special issues, the jury found that Shell failed to exercise ordinary care in making the premises a safe place for Waxler to work and in failing to inspect the

premises. The jury also found that such omissions constituted a proximate cause of the occurrence in question; that the manner in which the workmen exited the job site created a dangerous condition, which Shell maintained; and that Shell either knew, or in the exercise of ordinary care, should have known of its dangerous nature. The jury further found that Shell had not exercised ordinary care to remedy the dangerous condition and that its failure to do so was also a proximate cause of the occurrence. The jury answered "no" to the issue inquiring whether Shell had failed to give the plaintiff a warning of the dangerous condition. In response to the contributory negligence issues, the jury found that Waxler had been negligent and that his negligence was a proximate cause of the occurrence. The jury also found that Waxler's percentage of negligence was 40% and Shell's was 60%. Based on the jury's verdict, the trial court awarded Waxler the sum of $260,458.14, representing the total amount of his damages, reduced by 40% of such sum, and by $29,341.86 which the court awarded to the intervenor, Texas Employers' Insurance Association, on its claim for subrogation benefits.

■ In its first two points of error, Shell challenges the legal sufficiency of the evidence, contending that there was no evidence showing that it owed a legal duty to protect the plaintiff from the type of injuries suffered. In reviewing these points of error, we consider only the evidence, and inferences therefrom, which tend to support the judgment and disregard all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965).

At the time of Waxler's injury, he was working on a construction project at the Shell OP–3 plant. In order to reach the job site, Waxler and his co-employees left their automobiles on Shell's parking lot and entered the plant premises through a gate in a chain link fence. A short distance inside the gate, Brown & Root had erected and was maintaining seven small buildings or shacks, separated by lanes about 4 feet in width. All Brown & Root employees were required to enter and exit the job site through these lanes. Because of the width of the lanes, only two employees could enter and exit through a particular lane at the same time.

Upon entry through the specified passageway, each employee would pick up a numbered brass token, which coincided with the number on his hardhat. The employee would keep this brass token with him throughout the day, and would use it to check out and return the tools necessary for his work. At the end of each work day, the employees were required to exit the job site premises through their designated lanes and return the brass tokens by placing them in a receptacle provided for that purpose. In this manner Brown & Root was able to audit its payroll and account for the daily whereabouts of its employees. This entry-exit system was called the "Brass Alley" or "Brass Shacks".

Waxler testified that the Brown & Root employees working at the OP–3 job site were not permitted to exit through the Brass Shacks until the whistle signaled the end of the working day. They were further instructed to remain on the other side of a railroad track located some distance from the Brass Shacks, until they heard the whistle. According to Waxler, there were at least a thousand Brown & Root employees then working at the OP–3 job site, all of whom left the premises at the same time each day. Upon hearing the whistle, this great crowd of people customarily ran from the railroad track to the Brass Shacks, through their respective lanes, out through the main gate and into the parking lot.

Waxler testified that on the day in question, he started running with the other employees toward the Brass Shacks, but just before entering his lane, he hesitated to avoid colliding with a co-worker who crossed in front of him. This delay caused him to be knocked down by the mass of co-workers trying to get through the Brass Shack lanes. He was dragged by momentum of the crowd through the Brass Shacks and was trampled by his coworkers between the Brass Shacks and the front gate. He

finally managed to drag himself up and out of the way by holding on to the chain link fence. As a result of this incident, he suffered a broken hip and other serious disabilities.

Waxler further testified that prior to the time he began working at the OP–3 job site, he had worked as a Brown & Root employee at another area in the Shell complex known as CPS. At this location, Brown & Root employees were also required to enter and leave the job site by way of Brass Shacks, but according to Waxler, the situation was entirely different from that existing at the OP–3 job site. At the CPS location, Shell security guards required Brown & Root employees to form orderly lines while existing the job site, and the guards prohibited running and "horseplay". Waxler said that although Shell security guards were present at the OP–3 location, they did not try to control the flow of employees exiting the job site, and that it was an every day occurrence for the employees to run through the Brass Shacks.

Mr. Hruska, a Shell safety representative contractor, was called to testify under the adverse party rule. This witness stated that it was his duty to keep track of all injuries sustained by the employees of contractors working for Shell and to see that Shell's contractors were performing their jobs safely. He said that Shell also had a project engineer on the job site who had total responsibility for all facets of the project, including safety. He stated that running was considered a safety violation, and that if he had observed employees running, he would have taken steps to remedy the situation. By way of example, he told how he had once noticed a contractor's employees riding two to three on a bicycle as they exited the plant. He said that he contacted the employing contractor and told the contractor that Shell considered this practice to be unsafe and that Shell expected the contractor to control it. The contractor then remedied the problem.

Another part of Mr. Hruska's duties was to make periodic inspections of the job site premises and to see that the contractors were implementing proper safety programs. He said that Shell was interested in seeing that anything constructed on its premises was used in a safe manner and that if a dangerous condition existed, Shell would have it rectified. Mr. Hruska admitted that he had testified earlier, in his deposition that Shell could order a contractor or contractor's employee off the job for a safety violation.

Mr. Hruska also testified that Shell security guards were charged with closing and opening the gates that lead to the parking area and that Brown & Root employees were required by Shell's security guards to form orderly lines when exiting the CPS project. He said that he had observed Brown & Root employees running through the Brass Shacks at quitting time, but that he had not seen them do this at the OP–3 area.

■ As a general rule, a landowner has no duty to protect the employees of an independent contractor from a dangerous condition brought on to the land, and maintained, and controlled by the independent contractor. *Strakas v. Gehring,* 360 S.W.2d 787 (Tex.1962); *Shell Chemical Co. v. Lamb,* 493 S.W.2d 742 (Tex.1973). Thus, where a dangerous activity is under the sole control of the independent contractor, any danger arising from that activity is the responsibility of the contractor, not the landowner. *Abalos v. Oil Development Co. of Texas,* 544 S.W.2d 627 (Tex.1976).

■ However, a landowner does have a duty to use reasonable care to keep the premises safe for business invitees. *Smith v. Henger,* 148 Tex. 456, 226 S.W.2d 425 (Tex.1950). Where a landowner interferes with or intermeddles in a dangerous activity conducted by an independent contractor, he may be held liable to the contractor's employees for injuries resulting therefrom. *Remuda Oil & Gas v. Nobles,* 613 S.W.2d 312 (Tex.Civ.App.—Fort Worth 1981, no writ). Also, where a landowner undertakes joint control with his contractor over a dangerous activity, he may be held responsible, as a joint tort feasor, to an injured employee of the contractor, even though his con-

trol is not exclusive. *See, Baca v. Sand, Inc.,* 600 S.W.2d 840 (Tex.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.).

■ There was evidence from which the jury could have reasonably inferred that Shell had assumed joint responsibility with its contractor for safety procedures to be followed by the contractor's employees working on Shell's premises. Although there was also testimony from which the jury could have decided that the Shell had merely monitored its contractors' safety practices and had tried to enlist their cooperation in adopting appropriate safety programs, we are required to consider only that evidence, and the reasonable inferences therefrom, which tend to support the jury's findings. It was the jury's duty to evaluate all of the testimony, and it was within their province to accept that version of the evidence which it considered most credible. Thus, in reviewing the record to determine the legal sufficiency of the evidence to support the jury's verdict, we do not consider testimony of the witnesses which is contrary to or inconsistent with the jury's findings. *Garza v. Alviar, supra.* For this reason, we disregard the testimony of Shell's safety representative contractor, Mr. Hruska, to the effect that the only reason Shell's security guards required Brown & Root employees to exit the CPS gate in an orderly fashion was so that the guards could inspect the employees' lunchboxes for stolen articles.

The jury expressly found that the manner in which the workmen exited Shell's premises constituted a dangerous condition; that Shell maintained this condition and either knew or should have known of its dangerous nature. The jury also found that Shell failed to exercise ordinary care in inspecting its premises and in failing to rectify the dangerous condition; and that Shell was negligent in failing to provide a safe place for Waxler to work. Shell did not object to the form of submission of these issues, and on the basis of the jury's findings, the trial court properly concluded that Shell was liable to Waxler for dam-

ages, as measured by the jury's findings on the comparative negligence issue.

We hold that the evidence is legally sufficient to support the jury's findings, and that based upon such findings, the trial court did not err in concluding that Shell was legally obligated to Waxler for injuries he sustained on its premises.

Shell's first two points of error are overruled.

■ In its third point of error Shell contends that the trial court erred in entering judgment for Waxler because he did not obtain an affirmative finding to the issue inquiring whether Shell had failed to warn him of the dangerous condition. It is Shell's position that Waxler was required to prove that it failed to remedy the dangerous condition and failed to warn others of its existence. In the absence of proof that Shell breached its duty *both* to remedy and to warn, Shell contends that Waxler did not meet his burden of proof. In support of its position Shell cites *Adam Dante Corporation v. Sharpe,* 483 S.W.2d 452 (Tex.1972); *J. Weingarten Inc. v. Razey,* 426 S.W.2d 538 (Tex.1968); and *Harris v. Atchison T. & S. F. Ry. Company,* 538 F.2d 582 (5th Cir. 1976).

A warning of the existence of a dangerous condition no longer constitutes a complete bar to the plaintiff's recovery in a negligence case, and the giving of such a warning bears only upon the issue of the plaintiff's contributory negligence. *See, Parker v. Highland Park,* 565 S.W.2d 512 (Tex.1978); *Farley v. M & M Cattle Co.,* 529 S.W.2d 751 (Tex.1975).

The third point of error is overruled.

■ Shell's fourth point of error complains of the trial court's admission in evidence of the testimony regarding the legal duties and obligations of Shell and Brown & Root. Under this point Shell argues that a witness may not testify to a legal conclusion, citing *Carr v. Radkey,* 393 S.W.2d 806 (Tex.1965); *Lindley v. Lindley,* 384 S.W.2d 676 (Tex.1964), Shell further asserts that the existence of a legal duty is a question of law. *See, Abalos v. Oil Devel-*

*opment Co. of Texas,* 544 S.W.2d 627 (Tex. 1976); *Cleaver v. Dresser Industries,* 570 S.W.2d 479 (Tex.Civ.App.—Tyler 1978, writ ref'd n.r.e).

Shell's safety representative contractor, Mr. Hruska, was extensively questioned regarding his duties and was asked whether Shell had an obligation to provide the plaintiff with a safe place to work. Another witness, Mr. Steven Harris, an engineer for Brown & Root, was asked what Shell could have required Brown & Root to do about rectifying a dangerous condition being maintained by the contractor on its property.

Although some of the questions asked of Mr. Hruska by Waxler's counsel tended to call for legal conclusions, the answers given by the witness did not pertain so much to Shell's contractual relationship with Brown and Root, as to the witness' perception of his own job responsibilities. Moreover, Mr. Hruska's answers to these questions tended to support Shell's theory that Shell merely monitored its contractors' safety practices and only made suggestions to its contractors regarding ways to improve their safety programs. Shell's complaint about Mr. Harris's testimony is unfounded because he testified only with respect to the action Shell would have taken in the event it discovered a safety violation by one of its independent contractors; his testimony did not constitute a legal conclusion. We hold that the matters complained about in Shell's fourth point of error do not present reversible error, and that point of error is overruled. Rule 434, Tex.R.Civ.P.

In its fifth point of error Shell contends that the trial court committed reversible error in permitting a Brown & Root engineer, Mr. Harris, to testify that Brown & Root had a financial interest in the case.

On cross-examination, Harris was asked if he was aware that his employer had a financial interest in the lawsuit. Mr. Harris stated that he was aware to the degree that he had been told by his counsel that Shell had a "hold harmless clause", but that he did not understand the legal implications of that term. He was then asked, "What does did this mean to you? The trial court sustained Shell's objection to the question, and the witness did not answer.

■ It was not improper for counsel to question the adverse witness about whether he had knowledge that his employer had a financial interest in the lawsuit. *Griggs Furniture Co. v. Bufkin,* 348 S.W.2d 867

(Tex.Civ.App.—Amarillo, 1961, writ ref'd n.r.e.). The trial court immediately sustained Shell's objection to the additional question pertaining to the witness' understanding of the legal meaning of a term. There is no indication that the trial court abused its discretion in this respect.

Shell's fifth point of error is overruled.

■ In its final point of error, Shell contends that the trial court erred by its answer to a question received from the jury during its deliberations. The jury sent a note to the trial court, which asked the following question: "Do you see Brown & Root and Shell Company as being one and the same or are they separate?" Over Shell's objection, the trial court sent the following note back to the jury: "You are instructed to follow the Court's charge as it has been submitted to you, and the evidence as you have heard it from the stand."

Shell contends that this note shows that the jury was confused regarding the identity of the real party in interest, and it argues that the court should have given the jury a clarifying instruction.

The trial court has considerable discretion in giving the jury additional instructions to assist it in its fact finding process. In giving such aid, the court must balance the threat of the possible effect of such instructions against its efforts to assist the jury in its fact finding role. Thus, the trial court must be careful not to invade the jury's fact finding province. *Stevens v. Traveler's Ins. Co.,* 563 S.W.2d 223 (Tex.1978).

In the instant case the trial court's written charge does not contain any glaring errors or confusing instructions, and it was not improper for the court to refer the jury back to its general written instructions. *Id.* at 228–229.

The specific question asked by the jury did not relate to any error on the face of the charge, and the testimony presented at the hearing on Shell's motion for new trial indicates that the verdict was based solely upon the mental processes and reasoning of the jury.

■ A court is not authorized to set aside a jury verdict even though the verdict may have been the result of a misinterpretation of the evidence or the court's charge. *Adams v. Houston Lighting & Power Co.,* 158 Tex. 551, 314 S.W.2d 826 (Tex.1958).

The sixth point of error is overruled.

The trial court's judgment is affirmed.

Concurring Opinion on Appellant's
Motion for Rehearing

COHEN, Justice.

Although I consider the appellant's arguments in point of error one to be strong based on the facts of this case, I concur in the majority opinion because, as it states, we are reviewing "no evidence" points of error and, therefore, we consider only the evidence and inferences therefrom which tend to support the judgment, and disregard all evidence and inferences to the contrary. *Graza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). If "insufficient evidence" points of error were presented, we would consider and weigh all the evidence, which, in my opinion, might well call for a different result regarding whether Shell assumed joint responsibility for safety procedures on this project.