**Mrs. Maria Toth FUTO,**
**Plaintiff-Appellant,**

**Insurance Company of the State of Pennsylvania, Intervenor-Appellant,**

**v.**

**LYKES BROS. STEAMSHIP CO., INC.,**
**Defendant-Appellee.**

**No. 83–3449.**

United States Court of Appeals,
Fifth Circuit.

Sept. 24, 1984.

Opinion on Rehearing Nov. 19, 1984.

---

**3.** *Gross v. Black & Decker (U.S.), Inc.,* 695 F.2d 858, 865 (5th Cir.1983); *Boeing Co. v. Shipman,* 411 F.2d 365, 376 n. 16 (5th Cir.1969) (en banc).

Peter L. Hilbert, Jr., New Orleans, La., for intervenor-appellant.

Alonzo T. Stanga, III, William R. Mustian, III, Metairie, La., for Futo.

Terriberry, Carroll & Yancey, William E. Wright, New Orleans, La., for defendant-appellee.

Before POLITZ, WILLIAMS, and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

John Futo, a machinist employed by Dixie Machine Welding & Metal Works ("Dixie"), died as a result of a fall on October 7, 1977 aboard a vessel owned by the defendant, Lykes Brothers Steamship Company, Inc. ("Lykes"). Futo was covered under the Longshoremen's and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901, *et seq.* His widow, alleging negligence on the part of the shipowner, sued Lykes as authorized under sections 5(b) and 33 of the LHWCA, 33 U.S.C. §§ 905(b) and 933.[1] The district court granted summary judgment in favor of the defendant-shipowner, Lykes. We affirm.

## I.

## FACTS

Dixie entered into a contract to perform a variety of repairs to the SS SHIRLEY LYKES in conjunction with a five-year survey required by Coast Guard regulations. Dixie began the survey work on September 30, 1977 and completed the repairs about five weeks later, on November 5. Throughout this interval, the ship was docked at the Andry Street wharf in the city of New Orleans. Although the vessel remained afloat on the Mississippi River, it had no power other than electrical power provided from ashore. No facilities were maintained for eating or sleeping aboard ship.

The usual crew for the SS SHIRLEY LYKES was not present during the repair work. However, employees of Lykes boarded the vessel daily to ensure the security of the ship and to check on the progress of Dixie's work. These included Captain Edward Powell, who was assigned to the vessel only during the repairs; Chief Engineer Otis Ratly, a long-time Lykes employee and a member of the vessel's regular crew; and Port Engineer Charlie Blay, an employee from the Lykes office in New Orleans. In addition, a Lykes shore crew

---

1. Mrs. Futo brought this action as the personal representative of her husband and as administratrix of his estate. The couple had two young children. The insurance carrier for Futo's employer intervened in this lawsuit as a plaintiff, seeking to recoup the LHWCA compensation it has paid Mrs. Futo out of any recovery on her claim against Lykes.

came onto the vessel at times to perform routine maintenance tasks.

The contract between Dixie and Lykes contained a number of detailed specifications for the work to be performed by Dixie on the vessel. On October 7, a Dixie supervisor had assigned Futo to work on the booms of the ship, a Dixie task described under item number 44 of the specifications. Item number 44 also imposes responsibility on Dixie to erect any scaffolding necessary for Dixie's employees to carry out the boom repairs and to remove any such scaffolding upon completion. At the time of his fall, Futo was attempting to remove a pin from the boom housing, a task that required him to work about ten to fifteen feet above the deck. A Dixie employee had constructed a scaffold for this purpose. Dixie intended to add a guardrail to the scaffold but had not yet done so.[2] Futo was not wearing any type of safety line or belt to prevent his fall. He slipped and fell to the deck below, suffering a fatal head injury.

John Futo's widow, the plaintiff Maria Toth Futo, sued the vessel owner, Lykes, for negligence, claiming that Lykes was negligent in failing to warn about and to correct a hazardous condition aboard the vessel—the missing railing of the scaffold—which led to her husband's death. About two years later the defendant filed a motion for summary judgment and the district court granted this motion on September 12, 1979. This Court affirmed without opinion. The United States Supreme Court, however, granted Mrs. Futo's petition for writ of certiorari on May 4, 1981, vacated our decision, and remanded the case to this Court "for further consideration in light of *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981)." *Futo v. Lykes Brothers Steamship Company, Inc.*, 451 U.S. 966, 101 S.Ct. 2040, 68 L.Ed.2d 344 (1981). This Court then remanded, without opinion, to the district court "for further proceedings consistent with *Scindia*," following which the defend-

ant again filed a motion for summary judgment. The district court denied this motion and set the case for trial. On February 8, 1983, however, the defendant filed a motion for rehearing on its summary judgment motion. The court granted this motion and entered summary judgment for the defendant. This appeal followed.

## II.

### DISCUSSION

This case involves the scope of the shipowner's duty to intervene as expressed in the Supreme Court's decision in *Scindia* when the owner has knowledge of a dangerous condition. Lykes contends that this duty applies only when the dangerous condition involves the ship's gear or equipment. The appellant avers that a shipowner may be responsible for any dangerous situation aboard the ship provided only that the owner or its crew has knowledge of the condition. In granting summary judgment, the district court adopted the position asserted by Lykes, finding that *Scindia* did not apply and that the controlling test is instead that expressed in two pre-*Scindia* cases, *Brown v. Mitsubishi Shintaku Ginko*, 550 F.2d 331 (5th Cir.1977), and *Gay v. Ocean Transport & Trading, Ltd.*, 546 F.2d 1233 (5th Cir.1977).

### LHWCA Amendments

The liability of a shipowner for injuries to longshoremen or other LHWCA-covered employees of independent contractors changed significantly with passage of the 1972 LHWCA amendments. Before these amendments a longshoreman injured while performing his duties on the ship could recover from the shipowner if his injury was caused either by the ship's unseaworthiness or the owner's negligence. The liability of the shipowner for unseaworthiness was without regard to fault and extended even to conditions caused by the stevedore or its employees. *See Helaire v. Mobil Oil Company*, 709 F.2d 1031 (5th Cir.1983). Where the stevedore was at fault, however, the shipowner could recov-

---

**2.** Nothing in the specifications indicates that the scaffold was not to have a guardrail.

er over against the stevedore. *Pluyer v. Mitsui O.S.K. Lines, Ltd.*, 664 F.2d 1243, 1246 (5th Cir.1982).

In the 1972 amendments, Congress abolished the longshoreman's right to recover for unseaworthiness and the stevedore's obligation to indemnify the shipowner.[3] *Id.* Section 905(b) of the LHWCA preserved the longshoreman's right to recovery against the vessel for its negligence,[4] but did not define the contours of the shipowner's liability. This task was left to be " 'resolved through the application of accepted principles of tort law and the ordinary process of litigation.' " *Helaire*, 709 F.2d at 1035, quoting S.Rep. No. 92–1125, 92d Cong., 2d Sess. 11 (1972); H.R.Rep. No. 92–1441, 92d Cong., 2d Sess. 7 (1972), U.S. Code Cong. & Admin.News 1972, p. 4698.

**Pre-*Scindia* Jurisprudence**

Prior to *Scindia* this Court had determined that actions brought under section 905(b) should be analyzed according to the land-based standards expressed in the Restatement (Second) of Torts, §§ 343 and 343A.[5] *Gay v. Ocean Transport & Trading, Ltd.*, 546 F.2d 1233, 1238 (5th Cir. 1977). In applying these standards, the Court in *Gay* refused to impose liability on the defendant-shipowner for an injury to a longshoreman that occurred because the stevedore had stacked pallets in an unsafe manner, thus creating an obviously dangerous condition. While rejecting the notion "that a vessel has no duty concerning any danger which is open and obvious to the stevedore or its employees," this Court agreed with the district court that the sole cause of the injury was the stevedore's negligence. 546 F.2d at 1240. The Court reasoned that "[e]ven though the crew of the vessel was aware of the dangerous condition presented by the stack of pallets, it was the stevedore who created the hazard in the first place and it was the stevedore that failed to tie the pallets down and then carelessly knocked one into the hold." *Id.* at 1242.

**3.** In addition, the amendments substantially increased the payments due the longshoreman from the stevedore for injuries occurring in the scope and course of employment. *Harris v. Flota Mercante Grancolombiana, S.A.*, 730 F.2d 296, 299 (5th Cir.1984).

**4.** Section 905(b) provides in relevant part:
"In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.... The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in the subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter."
Section 2(21) of the LHWCA, 33 U.S.C. § 902(21), provides:
"(21) The term 'vessel' means any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment, and said vessel's owner, owner pro hac vice, agent, operator,

charter or bare boat charterer, master, officer, or crew member."

**5.** These read as follows:
"§ 343. Dangerous Conditions Known to or Discoverable by Possessor
"A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
"(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
"(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
"(c) fails to exercise reasonable care to protect them against the danger.
" . . . .
"§ 343 A. Known or obvious Dangers
"(1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.
"(2) In determining whether the possessor should anticipate harm from a known or obvious danger, the fact that the invitee is entitled to make use of public land, or of the facilities of a public utility, is a factor of importance indicating that the harm should be anticipated."

A similar rationale was applied in *Brown v. Mitsubishi Shintaku Ginko,* 550 F.2d 331 (5th Cir.1977). That case involved an injury to an employee of the stevedore caused by an oversized rack on a forklift that was used in cleaning a cargo hold. The stevedore, who had supplied both the rack and the forklift, was aware of the potential problem posed by the unstable rack but chose to do nothing. This Court based its affirmance of the district court's summary judgment in favor of the defendant-shipowner on two reasons: (1) the hazard was solely the product of the stevedore's work on the ship, and (2) the stevedore and its employees were in a better position to rectify the problem than was the defendant-shipowner. 550 F.2d at 336. The Court specifically noted that the shipowner had no duty under these circumstances even if the ship's crew was aware of the danger. *Id.*

Our jurisprudence thus established that a shipowner would not be held liable under section 905(b) for dangerous conditions created by the stevedore and causing injury to its employees. This standard applied even where the owner had actual knowledge of the unsafe condition.

Differences developed among the Circuits, however, over the nature of the vessel's duty to the longshoreman. While the Second and Fourth Circuits also adopted the Restatement approach applied in *Gay* and *Brown,* the First and Third Circuits rejected this approach, "holding that the owner could be negligent only if it were participating in the activity and the stevedore were not in exclusive control of the work area." *Helaire,* 709 F.2d at 1035. The Ninth Circuit applied a more generous formulation, imposing a continuing duty on the shipowner to inspect conditions of the ship during the stevedoring operations.[6]

## The *Scindia* Principles

In *Scindia Steam Navigation Co., Ltd. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), the Supreme Court sought to resolve the conflict that had developed among the Circuits in interpreting section 905(b). *Scindia* involved a longshoreman who was injured by sacks of wheat that fell from a pallet suspended by a defective ship's winch. Although the winch had been malfunctioning for two days before the accident, the stevedore continued to use it. The court remanded the case for determination of whether the shipowner knew of the problem and should have intervened to prevent the injury. In so doing, the Supreme Court articulated several principles that govern the duty of a vessel toward the employees of a stevedore.[7]

We have stated that the "most basic" of these is that the "primary responsibility for the safety of the longshoremen rests upon the stevedore: 'As a general matter, the shipowner may rely on the stevedore to avoid exposing the longshoremen to unreasonable hazards. The ship is not the common employer of the longshoremen and owes no such statutory duty to them.'" *Helaire,* 709 F.2d at 1036, quoting *Scindia,* 451 U.S. at 170, 101 S.Ct. at 1623. "[T]he 1972 Amendments ... did not otherwise disturb ... the rightful expectation of the vessel that the stevedore would perform his task properly without supervision by the ship." *Scindia,* 451 U.S. at 170, 101 S.Ct. at 1623. Specifically, the Supreme Court relieved the shipowner from any requirement to inspect or to supervise a stevedore's operations absent custom, law, or contractual provision to the contrary. The shipowner has no general duty to discover dangerous conditions "that develop within the confines of the cargo operations that are assigned to the stevedore." *Id.* at 172, 101 S.Ct. at 1624.

---

**6.** *Santos v. Scindia Steam Navigation Co., Ltd.,* 598 F.2d 480 (9th Cir.1979), *affirmed and remanded, Scindia Steam Navigation Co., Ltd. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981).

**7.** We have held that these principles apply as well to LHWCA-covered employees of independent contractors other than stevedores. *Hill v. Texaco, Inc.,* 674 F.2d 447 (5th Cir.1982).

The *Scindia* Court, however, also expressed an exception to this general principle, finding that the shipowner will have a duty to intervene to protect the longshoremen when two conditions are present. The shipowner first must know of a danger [8] on the ship and, second, must know that the stevedore is not taking steps to remove the danger. *Id.* at 178, 101 S.Ct. at 1627. *Harris v. Flota Mercante Grancolombiana, S.A.*, 730 F.2d 296, 299 (5th Cir.1984). "[W]e agree that there are circumstances in which the shipowner has a duty to act where the danger to longshoremen arises from the malfunctioning of the ship's gear being used in the cargo operations." *Scindia*, 451 U.S. 175, 101 S.Ct. 1626.[9]

**Duty to Intervene**

We have noted that the impact of *Scindia* on the extent of a vessel's duty under section 905(b) "as previously applied in this Circuit ... remains less than clear." *Helaire*, 709 F.2d at 1036. In this case, we must consider whether the duty of a shipowner to intervene as articulated in *Scindia* undermines the rationale of the limitations on a shipowner's duty expressed in our decisions in *Gay* and *Brown*. We determine that it does not in this context and that the general standard expressed in those cases is controlling to prevent the imposition of such a duty under the present facts.

■■■ We begin by noting that the claim in this case concerns a failure to act on the part of Lykes employees rather than any active negligence on their part. It is a fundamental principle of tort law that one cannot be liable for negligence based on a failure to act unless one first has a duty to act. This principle is reflected in the general rule that one employing an independent contractor such as Dixie is normally not under a duty to take affirmative action to protect the employees of that independent contractor from injury in the course of the contracted for work. *See generally* discussion of Restatement sections concerning independent contractor in *Hess v. Upper Mississippi Towing Corp.*, 559 F.2d 1030, 1033–35 (5th Cir.1977), *cert. denied*, 435 U.S. 924, 98 S.Ct. 1489, 55 L.Ed.2d 518 (1978). *See also, e.g., Hyde v. Chevron, U.S.A., Inc.*, 697 F.2d 614, 630 (5th Cir. 1983) (Louisiana law); *Lathers v. Penguin Industries, Inc.*, 687 F.2d 69, 72–73 (5th Cir.1982) (applying Texas law). The general rule is subject to certain exceptions, one of which applies when the employer retains control over the "operative details" of the independent contractor's work. *Hess*, 559 F.2d at 1033–35; *Lathers*, 687 F.2d at 73. Moreover, a landowner's duty under Restatement (Second) of Torts, §§ 343 and 343A, respecting conditions of the premises extends to employees of an independent contractor of the landowner. *See, e.g., Walker v. Blacksea S.S. Co.*, 637 F.2d 287, 289–90 (5th Cir.1981). But not every dangerous situation created by the operations of the independent contractor is a condition of the premises for this purpose with respect to the contractor's employees merely because of its location on the land. *See, e.g., Flynn v. United States*, 631 F.2d 678, 681 (10th Cir.1980); *Shell Oil Company v. Waxler*, 652 S.W.2d 454, 457 (Tex.App.— Houston [1st Dist.] 1983, writ ref'd n.r.e.) ("As a general rule, a landowner has no duty to protect the employees of an independent contractor from a dangerous condition brought on to the land, and maintained, and controlled by the independent contractor.").

Exceptions of this sort to the general rule are largely sensible ones; they recog-

---

8. The shipowner can be charged with knowledge of a defect where the defect exists at the outset—before the stevedoring operations begin. The ship is "deemed" to have knowledge of a preexisting defect. *Id.* at 176, 101 S.Ct. at 1626.

9. The Court in *Scindia* also recognized the general duties owed by a shipowner to a stevedore and his employees. The owner must first take care to deliver to the stevedore a ship that is safe "with respect to the condition of the ship's gear, equipment, tools, and work space to be used in the stevedoring operations." 451 U.S. at 167, 101 S.Ct. at 1622. In addition, the owner must warn the stevedore of hidden unsafe conditions of the ship that are known or should be known to the owner. *Id.* These duties are not at issue in the present case.

nize that one has an affirmative responsibility toward others when one has taken an active part in directing the manner in which those others perform their tasks or when one creates or is generally responsible for a dangerous situation that causes harm. And it is reasonable and desirable to hold a landowner responsible for dangerous conditions that exist on his land before a contractor begins work. The landowner is, after all, in the best position to appreciate and correct these dangers. One is not liable, however, simply because one uses the services of an independent contractor. Nor is one liable because of the mere fact that the contractor performs his work on one's land or, as in this case, on one's ship. We believe that our *Brown* opinion and the Supreme Court's decision in *Scindia*, including the exception expressed in that case, are generally grounded on these principles.

In this context, we note that the parties in this case have focused their arguments on whether or not there is a distinction, for purposes of applying *Scindia*, between conditions involving the ship itself, its gear, or equipment and other hazards that may occur aboard a ship. There is authority for such a distinction, both in the language of *Scindia* and in that contained in our post-*Scindia* cases. *See, e.g., Lewis v. Timco, Inc.*, 697 F.2d 1252, 1256 (5th Cir.), *modified in other respects*, 716 F.2d 1425 (5th Cir.1983) (en banc) ("The defective equipment ... was not part of the VICKSBURG's regular gear."). We recognize that the fact that a condition involves the ship itself, its gear, or equipment is relevant, and in some circumstances may be determinative. The shipowner, after all, is generally primarily responsible for repairing his own ship, its equipment, or gear, and usually stands to gain the most by its proper maintenance. Moreover, the owner likely stands in the best position to appreciate the danger caused by a defect in the ship itself, its gear, or equipment. However, we are reluctant to adopt any across-the-board rule that the involvement of a dangerous condition of the ship itself, its gear, or equipment, is in all circumstances *per se* either necessary or sufficient to impose a duty on a shipowner having knowledge of the situation. To impose a duty to intervene on the shipowner, respecting dangers not created by it which are obvious to the stevedore's employees and arise during and in the area of the stevedore's operations, *something more* is required than the mere shipboard location of the dangerous situation and the shipowner's knowledge of it. In many circumstances, the requirement for "something more" may be satisfied if the accident is caused by a defective condition of the ship itself, its gear, or equipment, but we do not categorically rule either that this requirement may never be satisfied in any other way or that involvement of a defective condition of the ship itself, its gear, or equipment will inevitably suffice for this purpose in every situation.[10] We prefer a broader and more flexible approach as generally expressed in our *Brown* opinion, though giving due recognition to the importance of the condition of the ship itself, its gear, and equipment.

■ Several considerations support our determination that, in line with *Brown*, to impose a duty to intervene on a shipowner, respecting dangers not created by it which are obvious to the stevedore's employees and arise during and in the area of the stevedore's operations, something more is required beyond the mere presence of the danger on board and the shipowner's knowledge of it. First, we believe this logically flows from the division of duty between the shipowner and the stevedore, or independent contractor, as described in *Scindia*. Once stevedoring or repair operations have begun, it is the *stevedore*, not

---

**10.** We find it premature to presently attempt to list every possible "something more" that in a given set of circumstances may be requisite or sufficient for the imposition of a duty on the shipowner. It may well be that as a practical matter the determinative factor will generally turn out to be whether or not a dangerous or defective condition of the ship itself, its gear, or equipment is involved.

the shipowner, who assumes the responsibility for the safety of its employees. The exception expressed by *Scindia* is a narrow one and, absent some relevant assumption of duty by the shipowner, does not, we believe, extend to an open and obvious transitory condition, such as the absence of a rail on the scaffolding in the present case, that is created entirely by the independent contractor, is under its control, and relates wholly to its own gear and operations.

Second, we rely, as did the district court, on this Court's decision in *Lewis*. There, Lewis, an employee of Timco, sued Atwood Oceanics, the vessel owner, for an injury Lewis received while using a defective tong to retrieve some equipment. He claimed that Atwood was at fault under section 905(b) because its employees were aware of his difficulty in using the tong. He argued that *Scindia* had altered the law of this Circuit to permit recovery under such circumstances. Rejecting his claim, this Court noted that the defective tongs were not part of the vessel's regular gear and that Atwood Oceanics neither controlled nor created the circumstances which led to Lewis's injury. Moreover, the Court noted in *Lewis* that the district court applied the proper test in citing *Brown* and *Gay*.[11] *Lewis* supports the district court's decision in the present case.[12]

We do not intend to suggest, however, that the standards articulated in *Gay* and *Brown* remain entirely intact after *Scindia*. Indeed, we have found to the contrary in *Helaire v. Mobil Oil Company*, 709 F.2d 1031 (5th Cir.1983). In *Helaire*, we considered the continued vitality of this Court's determination in *Gay* that actions under 33 U.S.C. § 905(b) would be resolved according to the standard for land-based torts under the Restatement (Second) of Torts. *Id.* at 1036. The issue in *Helaire* was whether a shipowner, once loading operations had begun, could be held liable for conditions that were open and obvious if the owner either knew of the condition *or* should have anticipated it. There we determined that under the Restatement standard as expressed in *Gay*, a vessel owner could be liable even in the absence of actual knowledge. We held, however, that under *Scindia* the vessel owner could be held liable for injuries to "employees of the stevedore resulting from open and obvious dangers only in the event of actual knowledge of the danger *and* actual knowledge that he cannot rely on the stevedore to remedy the situation." *Helaire*, 709 F.2d at 1038–39 (emphasis in original) (footnote omitted). Our holding in *Helaire* was that *Scindia narrowed* the scope of liability allowed under our previous cases.

The appellant argues, however, that *Helaire* and *Hill v. Texaco Oil Company*, 674 F.2d 447 (5th Cir.1982), support the imposition of liability on Lykes in this case. Specifically, appellant contends that these cases show that section 905(b) is not limited to hazards involving the ship itself, its gear, or equipment. We do not read these cases as necessarily supporting appellant's position nor as imposing liability in any event. In *Hill*, one of the plaintiff's contentions was that the shipowner knew that he was working without proper safety equipment in a rusted tank and therefore had the duty to intervene. Because the

---

**11.** *Lewis* also cites this Court's opinion in *Stockstill v. Gypsum Transportation*, 607 F.2d 1112, 1117 (5th Cir.1979), which expresses a rule that "the owner of a vessel is not liable for known or obvious hazards where either the stevedore or his employee is in better position to appreciate fully the risk and avoid the danger, particularly where the danger is within the control of the stevedore's own employees."

**12.** The plaintiff argues that *Lewis* concerns a question of control over a hazard and does not express any distinction based on a ship's gear or equipment. Even if this interpretation is correct, however, Dixie, not Lykes, was in "control" of the scaffold that caused the injury. Further, Dixie created the circumstances causing the injury, a factor noted in *Lewis*. 697 F.2d at 1257. *See also Sarauw v. Oceanic Navigation Corp.*, 655 F.2d 526, 530 (3rd Cir.1981), *cert. denied*, 456 U.S. 914, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982) (concurring opinion) ("control and duty, rather than ownership ... [are] ... crucial factor[s] in imposing liability"). We point out, however, that this Circuit, unlike the Third Circuit, did not adopt the control test.

Court in that case found that the shipowner had no actual knowledge of the hazard, it did not consider whether or not liability could be imposed for this type of condition. Moreover, the thrust of the plaintiff's claim in *Hill* was that the ship's tank itself was inherently dangerous. *Helaire* involved a claim by a roustabout that he was required to perform unloading duties aboard a ship in rough seas resulting in his falling and injuring his knee. Arguably, this condition, while not part of the ship's gear or equipment, was nevertheless a condition of the ship. In addition, the hazard in *Helaire* was not created either by the employee or his employer.

Finally, in support of her position, appellant cites two decisions from other circuits, *Woodruff v. United States*, 710 F.2d 128 (4th Cir.1983),[13] and *Bueno v. United States*, 687 F.2d 318 (9th Cir.1982). We are not persuaded by these cases that our view is incorrect.[14]

In *Woodruff*, a longshoreman was seriously injured when he fell from an upper deck of a Navy vessel. While the ship had affixed safety nets around most of the deck to prevent such an accident, the spot at which the employee fell required manually placing safety stanchions in holes on the deck for this purpose. These safety stanchions were under the Navy's control and were available but were not in place, a decision made by the independent contractor. The Fourth Circuit found that the Navy knew that Woodruff and other employees were working without this protection and held the shipowner liable under section 905(b). *Woodruff* thus has arguably distinguishing features. The stanchions in that case were a part of the ship's

equipment, designed to be used to prevent the very kind of accident that occurred, and were under the shipowner's control. Moreover, in the present case, unlike the situation in *Woodruff*, the independent contractor, Dixie, had by contract the responsibility for erecting the scaffold.

In *Bueno*, the independent contractor built a scaffold and also constructed floodlights to accomplish its work. The floodlights, which were defective, were left on the scaffold overnight and started a fire. After the charred boards were removed, an employee of the contractor unsuspectingly stepped on the scaffold and fell through the open space. 687 F.2d at 319. The Court reversed a summary judgment for the defendant, finding that there was a fact question regarding whether or not the vessel owner, the United States, had exercised due care. *Bueno* based its decision in part, however, on a determination that the shipowner could be held liable on the basis of constructive knowledge, a view that we rejected in *Helaire*. Further, *Bueno* rested on a duty to make *safety* inspections which the shipowner had assumed. As the Court there stated, "The critical allegations made by the plaintiff in this case are that the Government voluntarily undertook to check the safety of the vessel on a regular basis, making inspections from time to time, while the sandblasting operation was in progress, and the danger continued throughout the course of the sandblasting." 687 F.2d at 320. A later Ninth Circuit decision has distinguished *Bueno* as a case involving a breach of a voluntarily undertaken duty to inspect, and has also held that knowledge alone does not impose

---

**13.** Plaintiff points out that this Circuit has cited *Woodruff* in *Webster v. M/V Moolchand, Sethiz Liners, Ltd.*, 730 F.2d 1035, 1038 n. 6 (5th Cir. 1984). *Webster*'s "*cf.*" citation, however, was for the general proposition of *Woodruff* that a shipowner has a duty to intervene if the stevedore is "obviously improvident." Moreover, the hazard in *Webster* was one involving a defective ship's winch, like *Scindia*. *Webster* did not adopt the *Woodruff* Court's application of the *Scindia* principle to its particular factual setting.

**14.** We also do not interpret *Lieggi v. Maritime Company of the Philippines*, 667 F.2d 324 (2d Cir.1981), as authority to the contrary. In that case, the Second Circuit stated that it had "formulated a more general principle, applicable not only to the ship's gear but also to transitory conditions on the ship . . . ." *Id.* at 328 (citation omitted). In *Lieggi* the plaintiff tripped on greased wire that was a part of the ship's gear, although not defective in the sense of the malfunctioning winch in *Scindia*. Moreover, in *Lieggi*, the ship's crew affirmatively undertook to correct the problem but failed to do so.

a duty to intervene. *Bandeen v. United Carriers (Panama), Inc.*, 712 F.2d 1336, 1337, 1340 (9th Cir.1983).[15] Thus, we are not convinced that either the Fourth or the Ninth Circuits would impose liability in a case such as the present one. To the extent that these Circuits would do so, however, we respectfully disagree.

### Applying the Standard

■ Here, as in *Gay* and *Brown,* the independent contractor created the hazard and was in the better position to correct it.[16] The scaffold was not an appurtenance of the ship but was rather a temporary structure created and used entirely by the independent contractor to perform its work. It belonged to and was controlled by the contractor. The lack of a railing was a transitory condition on this temporary structure, and its absence and the danger posed thereby were open and obvious to the contractor and its employees. There was no affirmative act of negligence by the shipowner nor even any expression of acquiescence in the use of the unsafe scaffold. The shipowner assumed no duty with respect to the scaffold. Under the circumstances, we find no basis for imposing liability on the shipowner even if it had the character of actual knowledge required by *Helaire.*

### Lack of Actual Knowledge of the Shipowner

There is another ground for upholding the summary judgment here. Even if the shipowner's actual *Helaire* knowledge would provide a sufficient basis for the imposition of liability, we determine that the record in this case affords no support for the conclusion that the shipowner had such actual knowledge.

In granting the defendant Lykes' initial summary judgment motion, the district court found that the crew members "did know of the danger, but failed to warn the deceased." The court repeated this finding in its rejection of Lykes' second request for summary judgment, which was brought after the remand of this case, stating that "[t]he ship's crew knew there were no guardrails, and they knew Dixie employees were continuing to work on the scaffold." However, the latter portion of this statement is without support in the record.

We agree that there is, at least arguably, a material fact issue regarding whether or not the Lykes employees knew about the scaffold and its lack of a protective railing. We find, however, that there is insufficient evidence to create any genuine factual issue respecting whether Lykes knew that Dixie employees were working on the scaffold, or would do so while it lacked a guardrail.

The record reflects that no Lykes employee actually admitted having seen the scaffold or having noticed the absence of a railing prior to the accident.[17] Captain Powell, however, stated that he had "maybe vaguely" noticed the structure before this time.[18] In addition, Charlie Blay,

---

**15.** We further note that this case is not one involving a basic appurtenance of the ship, such as the gangway in *Sarauw v. Oceanic Navigation Corp.*, 655 F.2d 526 (3rd Cir.1981), *cert. denied,* 456 U.S. 914, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982) (holding shipowner responsible to maintain safety of gangway supplied by stevedore where gangway was only means of access from ship). Nor is this a case where the shipowner has joined in a decision to have the employees continue work despite a dangerous condition. *See Evans v. Transportacion Maritime Mexicana SS "Campeche,"* 639 F.2d 848 (2d Cir.1981).

**16.** Indeed, Futo's supervisor was aware that it was dangerous to work on a scaffold without a railing, as were the other Dixie employees, but assigned his employees to do so anyway.

**17.** Captain Powell and Chief Engineer Ratly each stated that he noticed the absence of a railing *after* the accident. Captain Powell agreed that it was unsafe to have employees working on a scaffold without a railing and stated that he "would never let any of my people do it."

**18.** Captain Powell's testimony was as follows:
"Q Had you noticed the scaffold before?
"A Maybe vaguely. This is like—well, I walk up and down the deck of that ship, and I don't see everything. But a lot of it, the only thing that registers is repair work going on. If these people had been working on a boom, I mean, this is the thing that sticks in your mind, that you are looking at what is being done, not at how they are doing it or any-

the Port Engineer and the Lykes employee charged with checking the progress of the work, stated that he "probably" saw the scaffold before Futo fell but did not "pay that much particular attention to it." The statement by Blay has particular relevance in view of the fact that his work required him to visit most areas of the ship at some point to determine what repairs needed to be made to the ship as a part of the "survey."

Considering Blay's testimony along with the statements by these two other Lykes employees that they "probably" or "maybe" noticed the scaffold, we find that the district court could have properly inferred that Lykes had actual knowledge of the scaffold. Moreover, having made this inference, the court could perhaps have further inferred that these employees knew of the lack of a railing, despite explicit statements by Powell and Blay that they did not discern the absence of a guardrail.

What we find critical here, however, is whether or not any Lykes employee actually saw a Dixie employee working on the scaffold. It is on this point that the plaintiff's "knowledge" claim founders. This factor is of particular importance in the context of this case, as Dixie employees were still working to complete the scaffold, including the installation of a guardrail, at the time of Futo's fall. Joe Martinez, a

Dixie employee who was responsible for erecting the platform for the scaffold, stated that he had completed his assignment at the time of the accident except for the guardrail. According to his testimony, he was cutting the iron for the rails when Futo fell.[19]

While Martinez started his work constructing the scaffold on October 6, the deposition testimony reflects that employees *first* worked off the scaffold on October 7. No Lykes employee stated that he had seen or even "probably" seen Futo or any other employee working on the scaffold on that day, however. Charlie Blay, who knew Futo and was probably the most likely of the Lykes employees to notice the on-going repair work, stated that he had seen Futo and another employee working on the boom on October 6.[20] Although Blay was unable to recall whether or not the employees were standing on scaffolding (or staging) when he saw them, the record shows that they were not.[21] On the day of the accident, Blay did not come aboard the ship until after noon. After he boarded, he apparently went to the engine room to check on the boiler repairs, a matter of concern at that time. Blay was in the engine room when he received word of Futo's injury.

The dangerous condition at issue in this case is not simply that a scaffold lacked

---

thing. It is kind of like driving down the freeway. You see cars on both sides, yet you are watching the guy in front of you."

Statements by Chief Engineer Ratly were much the same:

"Q Do you know how long that scaffold had been up there?

"A I have no idea.

"Q Had you seen it before the day of his death.

"A Not that I recall. I mean, I didn't—I wasn't looking for it or anything. I could have walked right by it, not seen it if it had been there. I mean, I don't remember seeing it, you know.

"Q So it might have been there a week before the man died?

"A It could have been. I really don't know."

**19.** Futo's immediate supervisor, Oscar Crespo, also testified that the guardrails were to be put in place on October 7, the date of Futo's fall.

**20.** Blay appeared to believe that this employee was Slavko Covic. Covic, however, did not work with Futo on the boom until the afternoon of October 7.

**21.** A Dixie employee, Charles Masson, stated that he worked on the boom step with Futo on October 6. He stated that he and Futo stood on the *inboard motor* to do their work and that they could not use the staging for this purpose. Masson also stated that he told Joe Martinez to build the scaffold under the area in which the work on the boom steps would take place. According to Masson, Martinez began the scaffolding on the afternoon of the sixth. Thus, it is also highly unlikely that there was even any scaffold on which to stand on October 6. Masson did not work on the day of the accident.

railing at some particular point during the course of its construction.[22] Rather, it is that Dixie employees were working on the scaffold without a guardrail or any other safety device, such as a belt or a line that might secure them against a fall. We find no evidence in the record to support the district court's determination that there was a genuine factual dispute as to whether the Lykes employees knew that the Dixie employees were working or would work under this condition.

Mere presence of the shipowner's employees on the ship does not prove knowledge of a dangerous condition. *Hill v. Texaco, Inc.*, 674 F.2d 447 (5th Cir.1982). In *Hill*, an employee of an independent contractor fell while working inside a tank on the vessel; he was wearing no safety line at the time. The district court found that Texaco was negligent because Texaco employees knew that Hill was not using proper safety equipment despite the danger of slipping while working in the tank. The district court inferred Texaco's knowledge from two pieces of evidence: (1) a statement by the ship's master that he saw the Evans personnel on deck before they descended into the tank and noticed they had no safety equipment at the time; and (2) the fact that the contractor had been working on the vessel for two days preceding Hill's fall. We rejected "such a speculative leap by the district court." *Id.* at 450. The rationale of *Hill* applies equally to the present case. There is simply insufficient evidence that Lykes employees knew that Futo and other Dixie employees were working on an unsafe scaffold without safety equipment to create a material fact issue. Mere presence of Lykes employees on the vessel and even their knowledge of the condition of the scaffold itself are simply not enough.

Our conclusion also finds some inferential support in the decision in *Wild v. Lykes Brothers Steamship Corporation*, 734 F.2d 1124 (5th Cir.1984). In *Wild*, this Court sustained a judgment in favor of Lykes against a Dixie employee who fell while climbing an appurtenance of the ship that could be used as either a guardrail or a ladder.[23] While finding that this appurtenance was known to the shipowner to be defective when used as a ladder, the district court also properly determined that Wild failed to establish knowledge on the part of Lykes that Dixie employees were using it for this purpose. Knowledge that the condition of an object renders it dangerous *if* used in a particular way or under particular circumstances does not of itself necessarily evidence the requisite knowledge of actual danger.

Under *Helaire* and *Scindia*, the shipowner, before being liable for failure to intervene in protection of the longshoreman, must, *inter alia*, have actual knowledge "that a dangerous condition exists and actual knowledge that the stevedore is not acting to protect the longshoreman." *Wild*, 734 F.2d at 1127. As in *Wild*, the appellant here has failed to meet these requisites and, therefore, cannot recover against the shipowner, even if such knowledge were alone a sufficient basis on which to impose a duty of shipowner intervention in the present context.[24]

---

**22.** The knowledge referred to in *Helaire* includes knowledge that the stevedore will not act to protect the longshoreman. At a minimum, this would require knowledge that men would work on the scaffold before its guardrail was emplaced.

**23.** We note that the dissent in *Wild* would impose liability because the ladder was a part of the ship's equipment and was defective when turned over to Dixie. This reasoning, however, would not apply to the present case.

**24.** Appellant also urges two other bases for imposing liability on Lykes. First, she argues that there is a fact issue regarding whether the ship

was in navigation, which it is asserted would impose a greater duty upon the captain to supervise the vessel. In support of this argument, she cites *Waganer v. Sea-Land Service, Inc.*, 486 F.2d 955 (5th Cir.1973), in which this Court held a jury question was presented regarding whether or not a ship undergoing repairs in a five-year survey, like the SS SHIRLEY LYKES, was in navigation. That case is not apposite. It dealt not with negligence and liability under the LHWCA, but rather with the status of the ship for purposes of applying the warranty of seaworthiness under *Seas Shipping Co., Inc. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), and *West v. United States*, 361 U.S. 118,

## III.

### CONCLUSION

Here, the hazard—the scaffolding which was unsafe to work on until its guardrail was installed as planned—was a temporary structure, not a part of the ship itself, its gear, or equipment, which was created and used entirely by the independent contractor, who both owned and controlled it. Nothing that the shipowner did, and nothing about the ship itself, or any operation of it, contributed to the hazard. The shipowner had assumed no duty in respect to the scaffold. The danger posed was open and obvious to the contractor and its employees, and the contractor was in the best position to correct it. We hold that in these circumstances the shipowner, Lykes, had no duty to intervene, even if it possessed the full measure of actual knowledge required by *Helaire*. We further hold that the summary judgment record here establishes that Lykes did not in fact have actual knowledge of the hazard and that the contractor would not correct it, and that as to this matter the record evidence presents no genuine factual dispute.

The summary judgment in favor of the shipowner, Lykes, is accordingly affirmed.

AFFIRMED.

### ON PETITION FOR REHEARING

Appellant moves for rehearing, calling attention to certain testimony, not discussed in our original opinion, which appellant claims demonstrates the existence of a genuine fact issue respecting whether Lykes actually knew Dixie employees were working on this scaffolding, without a safety belt or the like, when it lacked a guardrail. It is not necessary to address this contention, however, for, as plainly stated in our original opinion, under the circumstances here Lykes would have no liability even if it had such actual knowledge. The petition for rehearing is accordingly DENIED.

80 S.Ct. 189, 4 L.Ed.2d 161 (1959). We find no reason to extend the distinctions made in these cases to a determination of liability under section 905(b) and *Scindia*. The issue, as described in *Scindia*, is whether the independent contractor had begun its work. Here, Dixie had done so. Moreover, the ship in this case, while perhaps capable of navigation in the sense that the engine had not been removed, was not *actually in* navigation. It was docked, without power, without facilities for sleeping on board, and without its sailing crew.

Appellant's second argument is based on an affidavit from her expert witness asserting that custom and regulations impose a duty of inspection upon the vessel owner. In particular, the affidavit asserts that under the "customs, regulations and applicable law of the shipping industry, the master of the vessel is responsible for knowing the various regulations for all the various contractors working on board his vessel, and to see that they are enforced." We reject the conclusions expressed in the affidavit and appellant's argument that they create a fact issue. To conclude otherwise would render meaningless the 1972 amendments to the LHWCA, as the owner would in effect become liable for the stevedore's negligence.